| | | |
|---|---|---|
| In re: | ) | Case No. 22-10571-(AIH) |
| | ) | |
| **Matthew M. Motil,** | ) | **Chapter 7** |
| | ) | |
| Debtor. | ) | **Judge Arthur I. Harris** |
| | ) | |
| | ) | |
| **Andrew R. Vara,** | ) | |
| **United States Trustee, Region 9,** | ) | |
| | ) | |
| Plaintiff, | ) | **Adv. Proc. No. 22-01084-(AIH)** |
| vs. | ) | |
| | ) | |
| **Matthew M. Motil,** | ) | |
| | ) | |
| Defendant. | ) | |

## OBJECTION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

The plaintiff Andrew R. Vara, the United States Trustee for Region 9 (the "United States Trustee") files this objection to *Defendant's Amended Motion to Dismiss the United States Trustee's Complaint to Deny Discharge Pursuant to 11 U.S.C. § 727* (the "Motion") filed on November 17, 2022, and respectfully requests that the Motion be denied with prejudice (this "Objection"). Docket No. 10  In support of this Objection, the United States Trustee states as follows:

### PRELIMINARY STATEMENT

1.  On September 30, 2022, the United States Trustee filed the *Complaint to Deny Discharge Pursuant to 11 U.S.C. § 727* (the "Complaint"). Docket No. 1. The Complaint is twenty-two pages long, consists of one-hundred and five numbered paragraphs, and included fourteen exhibits. *Id. et seq*. The United States Trustee filed it after creditors filed eight prior complaints alleging more or less the same facts: namely, that the Defendant committed frauds against

1

individual creditors (the "Creditor-Investors") by promising them high interest returns on real estate investments through private lending. Many Creditor-Investors invested their IRA or other retirement funds, and some committed their life savings. In exchange for moneys loaned by Creditor-Investors to the Defendant's wholly owned limited liability companies (the "100% Corporate Entities"), the Defendant executed corporate promissory notes and mortgage documents that he gave to the Creditors-Investors. The Defendant did not personally guarantee the notes. The Defendant frequently represented in email correspondence to the Creditor-Investors that he would record their mortgages. Mostly, he did not record the mortgages. By not recording the mortgages, he could give multiple mortgages on the same property, and so he did.

2.      As thoroughly laid out in the Complaint, in at least eleven instances, the Defendant gave Creditor-Investors documents that appeared to be properly notarized mortgages, but which in fact contained digital forgeries of notary seals and signatures (the "Digital Notary Forgeries")— essentially an Adobe photocopy of a completed notary page once prepared by his assistant Kristin Kish ("Kish"). The Defendant needed only to apply his own digital signature and type in the date that the purported mortgage was "notarized." Remarkably, the Defendant continued to exploit this expediency even after Kish terminated her employment.

3.      Presently, it is not at all clear what the Defendant did with the money the Creditor-Investors lent him. Simply looking at the schedules and forms (collectively, the "Schedules") that the Defendant filed with his petition (the "Petition"), one would have a difficult time ascertaining the amounts of money in question. Largely because the Defendant scheduled the Creditor-Investors' claims as "unknown" and thus $0.00, the Defendant's liabilities ($280,274.00) barely exceed his assets ($277,500.00).  Bankr. Case No. 22-10571-(AI), Docket No. 1 at 8, 10–16, 19–49. It has taken considerable time simply to estimate the amounts of cash that the Defendant

2

actually acquired, let alone verify how he dissipated it.

4.     As the movant, the Defendant has the burden to demonstrate that the Complaint fails to state a claim. On the face of the Motion, the Defendant asserts that the United States Trustee pled his Complaint so inadequately that it fails to state a single claim on which relief may be granted. What the Defendant means, however, is that the Bankruptcy Code does not (quite) provide a statutory framework that could prevent his discharge, however dishonest his acts may have been. The Defendant may have authorized the sale of real estate in the year before filing that he gave multiple mortgages to Creditor-Investors, but title passed from his 100% Corporate Entity not from the Defendant personally. He may have given phony paper to creditors, but the Digital Notary Forgeries do not impede the chapter 7 trustee Virgil E. Brown Jr. (the "Trustee") from ascertaining the estate's interest in the corporate entities that own the real estate, especially since the mortgages also were never recorded. The Defendant may no longer have the principal that the Creditor-Investors lent him, but to require him to explain satisfactorily what he did with that money, the United States Trustee needs first to plead with particularity exactly how much money he really controlled.

5.     As set forth in this Objection, none of the Defendant's arguments stand up to scrutiny. Numerous courts have dealt with situations precisely like the ones the Defendant presents and have provided reasonable authorities planted firmly in the language of the Bankruptcy Code to thwart dishonest debtors who sought to obtain chapter 7 discharges. In light of those authorities, each of the United States Trustee's four counts plainly and adequately state valid legal claims against the Defendant that will warrant a denial of the Defendant's discharge to the extent they are supported by evidence. Accordingly, the Court should enter an order denying the Motion with prejudice.

## PERTINENT FACTS

6.      On March 7, 2022, the Defendant filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Code (the "Code") in the underlying bankruptcy case (the "Bankruptcy Case"). Bankr. Case No. 22-10571. Docket 1.

7.      Along with his petition, the Defendant filed bankruptcy schedules and a *Statement of Financial Affairs for Individuals Filing for Bankruptcy* ("SOFA") that he signed under penalty of perjury (collectively, the "Schedules"). Bankr. Case No. 22-10571. Docket 1 at 6, 57, 59 & 64.

8.      On his Schedules, the Defendant disclosed a 100% membership/ownership interest in seventeen limited liability companies (the "100% Corporate Entities"). Bankr. Case No. 22-10571. Docket 1 at 12–13.

9.      Upon information and belief, the Defendant exercised complete control over the business operations of the 100% Corporate Entities, such that the 100% Corporate Entities had no separate mind, will, or existence of their own such that 100% Corporate Entities existed simply as the alter egos of the Defendant.

10.     In exercising control over the business operations of the 100% Corporate Entities, the Defendant freely transferred property including funds but possibly also other assets from himself individually to and from the 100% Corporate Entities and between the 100% Corporate Entities with complete disregard of the legal distinctions between himself and the 100% Corporate Entities and among the 100% Corporate Entities.

11.     The Defendant failed to schedule his actual interests in two Ohio limited liability companies: Dope Ideas LLC, organized on August 7, 2017; and North Shore Ecom LLC, organized on March 11, 2019. Bankr. Case No. 22-10571. Docket 1 at 12–13.

4

12. The Defendant, individually and/or through one or more of the 100% Corporate Entities, solicited and received funds from at least fifty-two Creditor-Investors represented on his Schedules as having claims for "unknown" amounts. Bankr. Case No 22-10571-(AIH), Docket No. 1 at 20–49.

13. Most of the Creditor-Investors lack sophistication and do not qualify as "accredited investors" as that term is used under Regulation D of the Securities and Exchange Commission. 17 C.F.R. § 230.500 *et seq.*

14. The Creditor-Investors lent funds to the Defendant individually and/or through one or more of the 100% Corporate Entities based on the Defendant's representations that he would secure the loans with valid mortgages on real property. In at least eleven instances, the Defendant did not provide valid mortgages on real property, but instead gave Creditor-Investors purported mortgages that he never notarized, although he made it appear they were properly notarized by affixing the Digital Notary Forgeries to the documents.

15. Creditor-Investors lent funds to the Defendant individually and/or through one or more of the 100% Corporate Entities based on the Defendant's representations that he would record the mortgages on real property or otherwise take action to ensure that the mortgages were recorded. The United States Trustee has collected numerous emails from the Defendant to Creditor-Investors that contain such representations. The Defendant generally did not record the mortgages, contrary to his representations to Creditor-Investors.

16. On or about April 8, 2021 (*i.e.*, within one year of the Petition Date), the Defendant individually and/or through the 100% Corporate Entity NS Equity transferred the real property located at 3539 West 50th Street, Cleveland, Ohio 44102 (the "West 50th Property") in consideration for approximately $32,000.00. Docket No. 1 at 17 (β 79).

17.     Certain Creditors-Investors have filed eight adversary proceedings under sections 523 and/or 727 alleging fraud and other bad acts by the Defendant.  Bonetta v. Motil, Adv. Proceeding No. 22-01043-(AIH); Oliver *et al*. v. Motil, Adv. Proceeding No. 22-01062-(AIH); Voller v. Motil, Adv. Proceeding No. 22-01047-(AIH); Lynch *et al*. v. Motil, Adv. Proceeding No. 22-01063-(AIH); Rehn v. Motil, Adv. Proceeding No. 22-01036-(AIH); Krause *et al*. v. Motil, Adv. Proceeding No. 22-01049-(AIH); Ace Deuce Capital, LLC et al. v. Motil, Adv. Proceeding No. 22-01048-(AIH); Cattaneo v. Motil, Adv. Proceeding No. 22-01032-(AIH).

18.     On September 30, 2022, the United States Trustee filed the Complaint. As set forth in the Complaint, the United States Trustee asserts that the Defendant (1) "with the intent to hinder, delay, or defraud a creditor or officer of the estate charged with custody of property under this title […] transferred […] or concealed […] property of the debtor, within a year before the date of the filing of the petition;" (2) that he "mutilated [or] falsified […] recorded information, including books, documents, records, and papers, from which the [Defendant's] financial condition or business transactions might ascertained, and [his] act[s] […] were not justified under all the circumstances of the case;" (3) that he "knowingly and fraudulently, in or in connection with the case, made a false oath or account;" and (4) that he "failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet [his] liabilities." 11 U.S.C. § 727(a)(2)(A), (3), (4)(A), & (5). Docket 1 at 19–22.

## LEGAL SUPPORT

19.     Federal Rule of Civil Procedure 12(c) ("Rule 12(c)") applies to adversary proceedings pursuant to Federal Bankruptcy Rule 7012(b). Fed. R. Civ. P 12(c); Fed. R. Bankr. P. 7012(b). Rule 12(c) states as follows:

> MOTION FOR JUDGMENT ON THE PLEADINGS. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

6

Fed. R. Civ. P 12(c).

20.     Likewise, Federal Rule of Civil Procedure 12(d) ("Rule 12(d)") applies to adversary proceedings pursuant to Federal Bankruptcy Rule 7012(b). Fed. R. Civ. P 12(d); Fed. R. Bankr. P. 7012(b). Rule 12(d) states as follows:

> RESULT OF PRESENTING MATTERS OUTSIDE THE PLEADINGS. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P 12(d).

21.     In considering a motion for judgment on the pleadings, the Court must assess, given the material required to be in the complaint, whether the plaintiff can prove a set of facts entitling him to recovery on the allegations against the moving party.

22.     In seeking to dismiss the Complaint, the Defendant relies on Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) ("Twombly") and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009) ("Iqbal"), and their progeny. Docket No 7 at 1–2.

23.     In making this assessment, the Court must take only well-pleaded factual allegations as true and reject allegations that are nothing more than "a formulaic recitation of the elements of a cause of action." Twombly, 127 S.Ct. at 194-65; Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1953, 173 L.Ed.2d 868 (2009). However, the court must "review the complaint in the light most favorable to the plaintiff, accepting all of the complaint's well-pled factual allegations as true to determine whether the plaintiff states a claim for relief." Oakes v. PNC Mortgage Co., 917 F.3d 523 (6th Cir. 2019) (citation omitted). However, "[t]hough the facts alleged in the complaint need not be detailed, they must be sufficient to raise a right to relief above the speculative level." *Id.*

7

24.     A motion for judgment on the pleadings may only be granted "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." Tucker v. Middleburg-Legacy Place, 539 F.3d 545, 549 (6th Cir. 2008).

25.     The Supreme Court's rulings in Twombly and Iqbal signal a move away from a regime supporting the adequacy of "notice pleading" established by Conley v. Gibson, 355 U.S. 41 (1957).

26.     The postures of cases like Twombly and Iqbal bear little resemblance to this case or bankruptcy discharge actions generally. Broadly, Twombly involved a class-action antitrust suit against the utility Bell Atlantic. Justice Souter demurred at the notion that the Court was requiring "heightened fact pleading of specifics." Iqbal 550 U.S. at 570. Nevertheless, the general thrust of the opinion is about reining in the tremendous costs of discovery in antitrust litigation and "discovery abuse" by plaintiffs targeting deep-pocket corporate defendants using vague posturing. Id. at 558–60 & n. 6. The Supreme Court sought to put some limits on plaintiffs who allege that corporate defendants "conspire" to violate antitrust laws on the obscure hope that with enough discovery, the proof will be turned over, or else the defendant will settle. Id. at 560–61.

27.     Iqbal involved a Pakistani national arrested in the wake of the September 11, 2001, attacks and subsequently deported. He subsequently filed a "Bivens" action against numerous federal officials, including then United States Attorney General John D. Ashcroft, citing the civil rights claims articulated in Bivens v. Six Unknown Fed. Narcotic Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed. 619 (1971). Iqbal, 556 U.S. at 666–68. Several of the defendants, including the Attorney General, were entitled to qualified immunity, a unique factor that as with the antitrust issues in Twombly again required the Court to consider the reasonableness of permitting the case to enter the discovery phase. Id. at 671–74; 684–86. Following Twombly, the Supreme Court held,

8

that while Federal Rule of Civil Procedure 8(a)(2) ("Rule 8") specifically requires a pleading to "contain a 'short and plan statement of the claim showing that the pleader is entitled to relief,'" that does "demand more than an unadorned, the defendant-unlawfully-harmed-me accusation." Iqbal at 670. Again denying that the Court was requiring heightened pleading, Justice Kennedy noted that "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, *but it does not unlock the doors of discovery* for a plaintiff armed with nothing more than conclusions." Iqbal at 679 (emphasis added).

28.     As a debtor in a chapter 7 bankruptcy proceeding, it is the Defendant who is seeking extraordinary relief in the form of a permanent discharge of his debts.  In re Muniz, 320 B.R. 697, 699 (Bankr. D. Colo. 2005) ("Those persons who seek the extraordinary relief of a bankruptcy discharge may not ignore their legal obligations to the court and the trustee[.]"); In re Salindardi, 307 B.R. 353, 357 (Bankr. D. Conn. 2004) ("The extraordinary relief of a discharge is considered a 'privilege', not a 'right', accorded only to debtors who conduct their financial affairs with honesty and openness."). Moreover, debtors petitioning for relief under Title 11 of the United States Code (the "Code") are bound by statutory duties of disclosure. *See* 11 U.S.C. § 521, 727(a)(3) & (5). Courts have described discovery in bankruptcy cases as "broad and unfettered," frequently calling it a "fishing expedition" with a positive connotation. In re Enron Corp., 281 B.R. 836, 840 (Bankr. S.D.N.Y. 2002) (citations omitted); In re Fearn, 96 B.R. 135, 137–38 (Bankr. S.D. Ohio 1989) (citations omitted).

29.     In non-bankruptcy civil litigation, Rule 12(c) is a gatekeeper; it shields the defendant against discovery before the plaintiff has stated a valid cause of action. In an adversary proceeding seeking to deny a bankruptcy debtor's discharge for concealing records, a motion under Rule 12(c) should fail precisely because a debtor petitioning for a discharge under chapter 7 is

9

already subject to "a duty to preserve those records that others in like circumstances would ordinarily keep." Stiff v. Stiff (In re Stiff) 512 B.R. 893, 899 (Bankr. E.D. KY. 2014) (quoting State Bank of India v. Sethi (In re Sethi), 250 B.R. 831, 839 (Bankr. E.D. N.Y. 2000)).

## COUNT ONE

30.    The Defendant argues that count one of the Complaint must be dismissed because the United States Trustee failed to plead with sufficient particularity that the Defendant transferred property within a year before the Petition Date with the intent to hinder, delay, or defraud a creditor or the trustee under § 727(a)(2).

31.    In paragraphs 6-13 of the Motion, the Defendant argues that the United States Trustee does not allege that the Defendant himself transferred the West 50th property but, rather, that NS Equity, a corporation owned and controlled by the Defendant, did so. Docket No. 10 at 2–5 ( ¶¶ 6-13).  According to the Defendant, discharge cannot be denied under § 727(a)(2)(A) for transfers made by corporate entities controlled by the debtor. Docket No. 10 at 3 ( ¶ 8).

32.    In the Complaint, the United States Trustee *did* plead that the West 50th Property was property of the Defendant, as required by § 727(a)(2)(A). Specifically, he alleged that even though the property was technically owned by one of the 100% Corporate Entities, the Defendant exercised such control over them that they "existed simply as the alter egos of the Defendant" and, thus, that there was no meaningful distinction between the Defendant and the 100% Corporate Entities. Docket No. 1 at 4 (¶¶ 20-21).

33.    Because the 100% Corporate Entities are registered in Ohio, shareholder liability is governed by Ohio law. The Supreme Court of Ohio identified three factors that must be established for a plaintiff to disregard distinctions between a corporate entity and its shareholder: (1) the shareholder and the corporation are fundamentally indistinguishable; (2) the shareholder exercised

10

control over the corporation to commit fraud; and (3) there is a causal connection between that control and the injury suffered by the plaintiff. Belvedere Condo. Unit Owners' Ass'n v. R.E. Roark Cos., 617 N.E.2d 1075, 1086 (Ohio 1993). The United States Trustee has plead all three elements with particularity.

34.     For the first element, "mere control over a corporation is not in itself a sufficient basis for shareholder liability" but, rather, "courts will permit individual shareholder liability only if the shareholder is indistinguishable from or the 'alter ego' of the corporation itself." *Id*. at 1085-86. In making its decision, "a court should focus on principles of equity and whether the relationship is so dominating that respecting it would be unjust." Corrigan v. U.S. Steel Corp., 478 F.3d 718, 724 (6th Cir. 2007) (citations omitted). A court may consider several factors including "whether corporate funds were commingled with personal funds" and "whether corporate property was used for a personal purpose." City of Springfield v. Palco Inv. Co., 992 N.E.2d 1194, 1213 (Ohio Ct. App. 2013) (citations omitted).

35.     Here, the United States Trustee avers that "the Defendant exercised complete control over the business operations of the 100% Corporate Entities" and that "the 100% Corporate Entities had no separate mind, will, or existence of their own such that [they] existed simply as the alter egos of the Defendant." Docket No. 1 at 4 (¶ 20). Further, he alleges that "the Defendant freely transferred property including funds but possibly also other assets from himself individually to and from the 100% Corporate Entities and between the 100% Corporate Entities with complete disregard of the legal distinctions between himself and the 100% Corporate Entities and among the 100% Corporate Entities." Docket No. 1 at 4 (¶ 21). Thus, the United States Trustee has sufficiently pled the first element with specific allegations about the lack of distinction between the Defendant and the 100% Corporate Entities.

36.     The second element requires a plaintiff to "demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." Dombroski v. WellPoint, Inc., 895 N.E.2d 538, 545 (Ohio 2008). However, "[c]ourts should apply this limited expansion cautiously toward the goal of piercing the corporate veil only in instances of extreme shareholder misconduct." *Id*.

37.     Both a fraudulent conveyance and the operation of a Ponzi scheme satisfy this element. *See* Palco, 992 N.E.2d 1194; Wash. Cty. Bd. of Developmental Disabilities v. United Re AG, et al., 2013 Ohio App. LEXIS 3509.

38.     In his complaint, the United States Trustee alleges that the Defendant used his total control of NS Equity to conduct a fraudulent transfer by selling the West 50th Property after misrepresenting to the Creditor-Investors the validity and enforceability of the mortgage liens exchanged for lending by creditors. Docket No. 1 at 15–18 (¶¶ 64-81) He also alleges that this transfer was in furtherance of a Ponzi scheme. Docket No. 1 at 18 (¶ 81).

39.     Lastly, a plaintiff in a veil-piercing action must establish "a causal connection between the shareholder's control of the corporation and the alleged injury or loss." Music Express Broad. Corp. v. Aloha Sports, Inc., 831 N.E.2d 1087, 1092 (Ohio Ct. App. 2005).

40.     Here, the Complaint clearly states that the Defendant used his control of the 100% Corporate Entities to injure the Creditor-Investors through fraudulent transfers and a Ponzi scheme. Docket No. 1 at 15–16 (¶¶ 64-68), 16–17 (¶¶70-81), 19–20 (¶¶91-93.)

41.     The Defendant is also wrong to suggest that a bankruptcy court cannot disregard a debtor's corporate entity to deny a discharge under § 727(a)(2)(A). *See* United States Trustee v. Zhang (In re Zhang), 463 B.R. 66, 79 (Bankr. S.D. Ohio 2012) ("in the context of Bankruptcy Code §§ 727(a)(2) and (4), corporate distinctions may be disregarded under alter ego and reverse

veil piercing theories and the assets of those entities, particularly bank accounts, be treated as the assets of the debtor when the facts warrant the application of those theories.") Indeed, courts on numerous occasions have disregarded the distinction between a debtor and debtor-owned corporate entities when it is clear that the debtor is indistinguishable from the entity and is using the entity to commit fraud or otherwise violate § 727(a)(2)(A). *See* Neary v. Mosher (In re Mosher), 417 B.R. 772, 780 (Bankr. N.D. Ill. 2009); Freelife Int'l, LLC v. Butler (In re Butler), 377 B.R. 895, 918-19 (Bankr. D. Utah 2006), aff'd 359 B.R. 356 (B.A.P. 10th Cir. March 19, 2007); Doubet, LLC v. Palermo (In re Palermo), 370 B.R. 599 (Bankr. S.D.N.Y. 2007); and Compton v. Bonham (In re Bonham), 224 B.R. 114 (Bankr. D. Alaska 1998).

42.     The Defendant argues that the United States Trustee has not pled with the specificity required for allegations of fraud by Federal Rule of Civil Procedure 9(b) (applied to bankruptcy cases by Federal Rule of Bankruptcy Procedure 7009). Docket No. 10 at 5–6 (¶¶ 14-16). Specifically, the Defendant complains that the United States Trustee has not alleged a nexus between the sale of the West 50th Property and an intent to hinder, delay, or defraud. *Id*. The Defendant has misconstrued Rule 9(b); the Complaint does, as a matter of law, meet its requirements for allegations of fraud. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed R. Civ. P. 9(b). Thus, allegations of fraud face a more rigorous pleading standard than other causes of action. *See* Heinrich v. Waiting Angels Adoption Servs., 668 F.3d 393, 403 (6th Cir. 2012).

43.     However, the Sixth Circuit has not adopted a strict reading of Rule 9(b). *See* Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679-80 (6th Cir. 1988). The purpose of Rule 9(b) is to give the defendant sufficient notice to "prepare a responsive pleading." *Id*. at

680. A fraud complaint "should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id*. In fact, courts should be wary of dismissing a fraud claim before discovery under Rule 9(b) because doing so "may permit sophisticated defrauders to successfully conceal the details of their fraud." Ballan v. Upjohn Co., 814 F. Supp. 1375, 1385 (W.D. Mich. 1992) (quoting Craftmatic Sec. Litig. v. Kraftsow, 890 F.2d 628 (3d Cir. 1989)).

44.     The Sixth Circuit has held that "[t]o satisfy Rule 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentation(s) upon which he relied." Bender v. Southland Corp., 749 F.2d 1205, 1216 (6th Cir. 1984). Further, although intent need be alleged only generally, the plaintiff "must nonetheless allege facts which will give rise to strong inference of a fraudulent intent." Ballan, 814 F. Supp. at 1387. It is important to note that if a plaintiff alleges widespread fraud, then "a single adequately pled claim of this nature would allow relators to satisfy Rule 9(b)'s pleading requirement and proceed to discovery on the entire scheme." United States ex rel. Ibanez v. Bristol-Myers Squibb Co., 874 F.3d 905, 915 (6th Cir. 2017).

45.     There are numerous examples of fraud claims surviving Sixth Circuit scrutiny under Rule 9(b). *See* United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., 34 F.4th 507 (6th Cir. 2022); In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 593-94 (N.D. Ohio 2004) (plaintiffs alleging securities fraud by an energy company and its executives satisfied Rule 9(b) where the complaint identified specific false and misleading statements about the safety and condition of a nuclear reactor); Ballan v. Upjohn Co., 814 F.Supp. at 1386 (false and misleading statements about the safety of one of the pharmaceutical company's most profitable drugs in 10-K statements); Bovee v. Coopers & Lybrand, 211 F. Supp. 2d 985, 988-90 (S.D. Ohio 2002) (securities fraud claims satisfied the 9(b) standard because the plaintiffs established intent by

pleading that the auditor had planned to drop the company as a client on account of several risk factors but stayed on as auditor after getting an increased fee).

46.     The Complaint, like the complaints in the cases just discussed, is sufficiently specific to meet the 9(b) standard. The United States Trustee alleges the time of the misrepresentations, which is required by the Sixth Circuit, as mentioned above. The United States Trustee alleges that the Defendant executed a promissory note to Roth for $67,000 and signed mortgages with Roth and Hansen on or around September 25, 2019. Docket No. 1 at 16 (¶¶ 67-68, 70). The Defendant executed a promissory note for $60,000 and signed a mortgage with Lynch on April 24, 2020. *Id*. at 16–17 (¶¶ 72-73). Finally, the United States Trustee alleges that the Defendant sold the property and concealed the sale from the Creditor-Investors on April 8, 2021. *Id*. at 17 (¶¶ 79-80). The United States Trustee also sufficiently alleges the place of the misrepresentations as <u>Bender</u> requires, indicating that all of the communications and misrepresentations refer to the West 50th Property. Docket 1 at 16–17 (¶¶ 66-80).

47.     Just like the plaintiffs in the above-cited cases, the United States Trustee makes specific allegations about the contents of the Defendant's misrepresentations. He alleges that the Defendant promised to the Creditor-Investors that the mortgages were valid, but also alleges that the mortgages to Hansen and Lynch were never notarized and, thus, were invalid under state law. Docket 1 at 16–17 (¶¶71, 74-75). Further, he alleges that the Defendant represented to the Creditor-Investors each would have a first-priority mortgage lien but reveals that the Defendant signed mortgages with three different people for the same property so they could not have all been first-priority liens as promised. Docket 1 at 16–17 (¶¶ 68, 70, 73, 76). The United States Trustee also alleges that the Defendant represented to Creditor-Investors that he would properly record all of the mortgages, but then alleges that the Defendant never recorded the mortgages. *Id*. at 17 (¶¶77–

78). The United States Trustee, like the plaintiffs in the securities fraud cases, has plead specific representations by the Defendant as well as allegations that those representations were false. Docket 1 at 16–17 (¶¶ 68–78).

48.     Finally, the United States Trustee has sufficiently plead an intent to hinder, delay, or defraud by the Defendant. Like in <u>Ballan</u>, here the United States Trustee has plead a specific motive by the Defendant in his actions that shows an intent to defraud—that the Defendant used the transaction in question to operate a Ponzi scheme by using the funds from later investors to pay earlier investors—and also alleges specific facts from which that inference can be drawn— the Defendant sold mortgages without notarizing or recording them (and thus depriving them of any enforcement value), sold mortgages to multiple unwitting parties for the same property, and then sold the property without telling the Creditor-Investors or alerting them that their mortgages would be unenforceable against the new owners. *See* <u>Ballan</u>, 814 F. Supp 1375; Docket 1 at 16– 17 (¶¶67–78, 81). While the United States Trustee only needed general allegations for its claim of an intent to hinder, delay, or defraud, he has gone above and beyond his obligation by pleading specific facts from which reasonable inferences of intent may be drawn.

49.     The Defendant also argues that the United States Trustee has not adequately plead fraud because he has not alleged that the sale was for less than market value and that the United States Trustee has not plead any of the "typical badges of fraud." Docket No. 10 at 5– 6, ¶¶14-15).

50.     While the typical badges of fraud identified by the Defendant in his Motion are often useful as red flags of fraudulent activity, they are by no means an exhaustive list of the only types of activity considered fraudulent. As discussed above, the United States Trustee very explicitly alleges the Defendant's fraudulent activities.

51.     The United States Trustee did not need to plead that the sale of the West 50th

Property was for below market value. While selling property to an insider for less than market value is one way for a debtor to run afoul of § 727(a)(2)(A), it is not the only way. As discussed earlier in this Objection, the United States Trustee has put forth specific, detailed pleadings that clearly demonstrate a transfer with an intent to hinder, delay, or defraud without discussing the West 50th Property's market value. The Defendant has not cited to an authority for his assertion that such a showing is necessary *because there is none.*

52.     According to the Defendant, the United States Trustee's allegations about the transfer of the West 50th Property lack the necessary facts to satisfy the <u>Twombly</u>/<u>Iqbal</u> standard. Docket 10 at 7 (¶ 18).

53.     The United States Trustee plead with specificity the necessary elements of a claim under § 727(a)(2)(A).

54.     A plaintiff must establish four things to succeed on an objection to discharge under § 727(a)(2)(A): (1) that the action at issue occurred within one year before the petition date; (2) that the actor was the debtor or the debtor's duly authorized agent; (3) that the actor transferred, destroyed, removed, or concealed the debtor's property or permitted it to be done; and (4) that such action or granting of permission was done with the intent to hinder, delay, or defraud the creditor and/or an officer of the estate (e.g., the trustee). 11 U.S.C. § 727(a)(2)(A); *See also* 6 Collier on Bankruptcy P 727.02 (16th 2022). Only the fourth element, intent, is at issue here.

55.     To prove intent, the plaintiff must show that the debtor acted with actual, not merely constructive, intent to hinder, delay or defraud. *See* <u>Kovacs v. McVay (In re McVay)</u>, 363 B.R. 824, 830 (Bankr. N.D. Ohio 2006) (citation omitted). The question of intent is a question of fact, not law. *See* <u>In re Snyder</u>, 152 F.3d 596 (7th Cir. 1998). Because debtors rarely admit to acting with such an intent, "a finding of actual intent may be based upon circumstantial evidence or

17

inferences drawn from a pattern of conduct." <u>First of Am. Bank v. Afonica (In re Afonica)</u>, 174 B.R. 242, 246 (Bankr. N.D. Ohio 1994) (citation omitted).

56.     In his complaint, the United States Trustee alleged that the Defendant accepted money from Creditor-Investors in exchange for a promissory note and a mortgage, implicitly warranted valid mortgages, told them in writing that he would record the mortgage, and that they would have first priority as lienholders. Docket No. 1 at 16–17 (¶¶ 67, 68, 70-79). However, he then failed to record the mortgages, rendered them invalid through notary forgeries, made multiple conflicting first-priority liens on the same West 50th property, and then sold the property without telling them. *Id*. (¶¶ 67, 68, 70-79). The United States Trustee reasonably inferred that the Defendant was acting with actual fraudulent intent by taking the Creditor-Investors' money for himself, using that money to keep up his promises to other Creditor-Investors as part of a ponzi scheme, or to escape the Creditor-Investors by selling the property and assigning them invalid, unenforceable mortgages and no way to recoup their "investment." Docket No. 1 at 17 (¶¶ 81-82).

57.     The Defendant argues that by not alleging that the Defendant was contractually forbidden from selling the West 50th property or that the Defendant was contractually obligated to notify the Creditor-Investors of a sale of the property, the United States Trustee has failed to sufficiently plead his case for count one. (Am. Mot. Dismiss ¶ 19, ECF No. 10.)

58.     The United States Trustee does not need to show that the sale of the West 50th Property violated a contract between the Defendant and the Creditor-Investors, and the Defendant is wrong to suggest that there is such a requirement.

59.     As already established, a plaintiff seeking a denial of discharge under § 727(a)(2)(A) does not need to establish that the defendant breached a contract. A plaintiff can, instead, point to circumstantial evidence and a pattern of behavior by the defendant to infer that he

acted with the requisite intent to hinder, delay, or defraud a creditor. *See* <u>In re Bluestone</u>, 102 B.R. 103 (Bankr. N.D. Ohio 1989) (citing <u>In re Devers</u>, 759 F.2d 751, 754 (9th Cir. 1985)).

60.     The United States Trustee has appropriately plead the reasonable inference that the Defendant committed fraud by selling unenforceable/invalid mortgages to the unsuspecting Creditor-Investors and then selling the property to a third party to make it more difficult for them to pursue claims against him (because they lack enforceable liens). Docket 1 at 17 (¶ 80). It is also reasonable for the United States Trustee to infer from the multiple offers of first-lien mortgages on the same property that these transactions were all part of a Ponzi scheme where the Defendant used the money received from later investors to pay earlier investors. Docket 1 at 17 (¶ 81).

61.     The Defendant's breach-of-contract argument is overly narrow and reflects a misunderstanding of § 727(a)(2)(A)'s purpose. The statute is designed to protect creditors from debtors who hide money and assets to which the creditors are entitled. It is written broadly to apply to the wide variety of schemes used by debtors to hide property. To narrow its application only to specific contexts like breach of contract or transfer to an insider for less than market value would be counter-productive and allow dishonest debtors to transfer away property and hide it from creditors. Put simply, a transfer made in furtherance of a fraudulent scheme is a fraudulent transfer.

62.     The Defendant compares the Complaint here to the plaintiffs' complaint in <u>Alshaibani v. Litton Loan Servicing LP.</u> *See* 528 F. App'x 462 (6th Cir. 2013); Docket 10 at 4 (¶ 11). In that case, a couple sued their mortgage servicer, alleging breach of the mortgage contract and unjust enrichment. <u>Alshaibani</u>, 528 F. App'x at 463. The Sixth Circuit affirmed the dismissal of their complaint under Rule 12(b)(6) because it only contained bare assertions that the servicer had misapplied their excess mortgage payments and did not point to any particular facts from which a reasonable inference of wrongdoing could be drawn. <u>Alshaibani</u>, 528 F. App'x at 464-65.

63.     <u>Alshaibani</u> is a poor comparison. The complaint here does not contain "naked" or "practically unadorned" allegations like those in <u>Alshaibani</u>. *Id*. at 465. Here, the United States Trustee plead specific facts about the mortgage sales as well as the sale of the West 50th Property. The complaint identified the specific property by address. Docket No. 1 at 16 (¶ 66). The United States Trustee stated the approximate date, amount of consideration, and mechanism (promissory note in exchange for a mortgage) for the first mortgage transaction with Specialized Trust Company FBO Amy Horner Roth. *Id*. (¶¶ 67–68). The United States Trustee also plead the approximate date and terms of the mortgage deals between the Defendant and "Hansen" and RA Trustee Services Company CFBO Kenneth P. Lynch III as well as the fact that the mortgages were not notarized and, therefore, invalid. *Id*. (¶¶ 70–74). While the allegations that the Defendant falsely represented to the Creditor-Investors that he would record their mortgages on the properties was initially based on information and belief, Creditors-Investors and the Defendant have now produced emails from the Defendant to Creditor-Investors containing precisely these representations. Paragraph 79 contains the specific relevant facts for the sale of the West 50th property – the corporate entity the Defendant used to sell the property, the amount for which it sold, and the approximate date of the transaction. Docket 1 at 17 (¶ 79). Paragraphs 80, 81, and 89-93 contain the legal conclusions and inferences that the United States Trustee reasonably drew from the facts plead earlier. Docket 1 at 17 (¶¶ 80–81) 19–20 (¶¶ 89–93).

64.     In paragraph 21 of the Motion, the Defendant asserts that the Complaint is lacking in facts, specifically that the United States Trustee has not specified the identity of the West 50th Property, the date of the transfer, and/or identity of the recipient. Docket No. 10 at 8 (¶ 21). However, this is simply not true. The Complaint identifies the West 50th Property at 3539 West 50th Street, Cleveland, Ohio 44102 as the property fraudulently transferred, and alleges that the

transfer took place on or about April 8, 2021, within one year of the petition date. Docket 1 at 16–17 (¶¶ 66, 68, 70, 73, 79, 80). Lastly, the identity of the recipient is completely irrelevant because the United States Trustee's allegations relate to the Defendant's use of the transaction to shield his money and assets from creditors, not any accusations that he transferred it to an insider.

65.     The Complaint is filled with specific, verifiable, and undisputed facts from which reasonable inferences about the Defendant's misconduct can be drawn. Docket 1 at 2–5 (¶¶ 6-29), 6–15 (¶¶ 32–54, 57, 61), 16–17 (¶¶  67–79), 18 (¶¶  82-87) No.1.) The facts discovered so far provide for strong inferences of wrongdoing by the Defendant and further discovery will be needed to know its full extent.

66.     In paragraph 22 of the Motion, the Defendant argues that because the United States Trustee did not plead in his complaint that the Defendant transferred the West 50th Property outside of the ordinary course of business, that the property was not sold for less than fair market value, or that the Defendant acted with an intent to hinder, delay, or defraud creditors or the trustee, count one should be dismissed. Docket 10 at 8–9 (¶ 22).

67.     To support this assertion, he compares this case to Bell v. Zurich Insurance Co., where the court dismissed for insufficient pleading a complaint that brought after the plaintiff's medical records were inadvertently shared with a third party and alleged false-light invasion of privacy, intrusion into seclusion, and inducement of wrongful disclosure of medical records. Id.; Bell v. Zurich Ins. Co., No. 3:16CV984, 2016 U.S. Dist. LEXIS 128876 (N.D. Ohio Sep. 21, 2016). For the false-light invasion of privacy claim, the plaintiff never alleged that the responsible employee knew she should not have obtained and forwarded his medical records, an essential element of the claim. Id. at *9-10. Similarly, the intrusion into seclusion claim failed because the plaintiff failed to allege an intent to intrude. Id. at *10-11. Lastly, the wrongful inducement of

disclosure of medical records claim failed because the plaintiff did not identify the different defendants and their roles in the disclosure. *Id*. at 11–12.

68.     The analogy to <u>Bell</u> completely fails. That plaintiff's complaint was dismissed because he not only did not plead enough specific facts, but he also failed to plead required elements of the claims he brought. *Id*. at *9-11. The Defendant is simply wrong that the United States Trustee was required to plead that the sale of the West 50th Property occurred outside the ordinary course of business or that it was sold for below market value. There is no requirement to plead as such under § 727(a)(2)(A) and Defendant cites none. Further, as explained earlier in this response, the United States Trustee has plead specific facts from which an intent to hinder, delay, or defraud on the part of the Defendant can be reasonably inferred. The Complaint presents a strong fact-based and well-developed series of allegations and is not a skeletal recitation of legal conclusions like the complaint in <u>Bell</u>.

69.     For the reasons stated above, the Court should deny the Defendant's request to dismiss count one of the Complaint.

## COUNT TWO

70.     The Defendant in his Motion argues that count two of the Complaint must be dismissed because the Defendant's Digital Notary Forgeries did not prevent the Trustee or creditors from ascertaining his financial condition or material business transactions. Docket No. 10 at 14–17. This is simply not true.

71.     The Complaint recites that the Defendant represented to Creditor-Investors that the mortgages he executed were valid under Ohio Law. Docket No. 1 at ¶¶ 59-61. At least eleven of the purported mortgages the Defendant gave to Creditor-Investors were not valid because of the Digital Notary Forgeries. The Digital Notary Forgeries actually prevented Creditor-Investors and

22

the Trustee from ascertaining the Defendant's business transactions. Creditor-Investors who received documents with Digital Notary Forgeries did not ascertain that the business transactions they had engaged in with the Defendant were legally invalid until months after they had occurred. At least one of the harmed Creditor-Investors and also the Trustee were unaware that the purported mortgages were invalid until after the United States Trustee's Rule 2004 exam, over six months after the Petition Date. Docket No. 1 at 14–15 (¶¶ 59–61).

72.    To support his position regarding the Digital Notary Forgeries, the Defendant relies heavily on <u>Randolph v. Fry</u>. *Id*. at 15–16 (¶¶ 45–47); <u>Randolph v. Fry (In re Fry)</u>, Nos. 20-20641-L, 20-00098, 2022 Bankr. LEXIS 251 (Bankr. W.D. Tenn. Jan. 26, 2022). There, the court granted summary judgment to a debtor against a § 727(a)(3) complaint where the debtor had inaccurately described transactions in various check registers, forged a third party's signature to have the third party's disability benefits sent to the debtor's address, filed false tax returns, and filed a false report with a probate court. The United States Trustee's complaint was dismissed because he "fail[ed] to allege or prove that [the debtor's] financial condition or business transactions could not be accurately ascertained." *Id*. at *18.   The court in <u>Fry</u> explicitly stated that the debtor's actions occurred pre-petition, were reflected in his financial records, and that he had already been ordered to pay non-dischargeable restitution. *Id*. at *20.

73.    The court in <u>Fry</u> held that it would only deny discharge when a mutilation or falsification of documents makes it *impossible* for creditors or the panel trustee to ascertain the debtor's financial conditions or material business transactions. *Id*. at *17. The court endorsed two tests for determining if discharge should be denied under § 727(a)(3). *Id*. The first, developed by the Third Circuit in <u>Meridian Bank v. Alten</u>, requires that the plaintiff show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such failure makes it impossible to

ascertain the debtor's financial condition and material business transactions." <u>Meridian Bank v.</u> <u>Alten</u>, 958 F.2d 1226, 1232 (3d Cir. 1992) (citation omitted). The second, developed by this court in <u>McDermott v. Neff</u>, in addition to the the two requirements from <u>Alten</u>, adds a requirement that the objector "show how the missing recorded information 'might' enable [the debtor's] actual financial condition or business transactions to be ascertained under the circumstances of the case." <u>McDermott v. Neff (In re Neff)</u>, Case No. 14-33442, Chapter 7, Adv. Pro. No. 15-3026, 2015 Bankr. LEXIS 4361, at *5 (Bankr. N.D. Ohio Dec. 28, 2015).

74.      That the first requirement of the <u>Alten</u> test is satisfied is not in dispute.

75.      For the second <u>Alten</u> requirement, the Defendant argues that like in <u>Fry</u>, he is entitled to judgment on the pleadings because his forgeries did not make it impossible for creditors or the trustee to ascertain his financial conditions or material business transactions. Further, he claims that the United States Trustee has not plead specifically how having valid mortgage documents was necessary. Docket 10 at 16 (¶ 48).

76.      This case can be distinguished from <u>Fry</u>. The four corners of the <u>Fry</u> opinion do not adequately divulge just how transparently well-understood the debtor's fraudulent activities were by the time of the adversary proceeding. The debtor in <u>Fry</u> had already been investigated by the Federal Bureau of Investigation, admitted to his fraud, been indicted, pled guilty, served time in federal prison, agreed to pay restitution to his victims and a monetary judgment to the United States, and had already permanently waived the discharges of each of his victims' § 523 claims. <u>See</u> Transcript of Plea Hearing at 14-26, <u>United States v. Stephen Douglas Fry</u>, no. 2:19-cr-20331 (W.D. Tenn. Oct. 26, 2020) (redacted) at <u>Exhibit A</u>; Plea Agreement at 1-2, <u>United States v.</u> <u>Stephen Douglas Fry</u>, no. 2:19-cr-20331 (W.D. Tenn. Dec. 5, 2019) at <u>Exhibit B</u>. Further, the court in <u>Fry</u> may have been influenced by certain "sympathy factors" in its decision: the debtor was

elderly; had fully cooperated with criminal investigations; had served his prison sentence during the COVID-19 pandemic; and had (it was argued) repaid his debt to society. *Id*. Denying the debtor's discharge of claims by institutional creditors (it was argued) would impede recovery for the crime victims.

77. Here, by contrast, the Defendant has not to the United States Trustee's knowledge made any amends for his dishonest acts. He has not agreed to waive the claims of the section 523 plaintiffs, let alone his Creditor-Investors generally. There is no evidence that he has repaid his debt to society in any meaningful way. The very public exposure of <u>Fry</u> is in no way analogous to the preposterously delicate defenses suggested by the Defendant here, *i.e.*, whether the fact that the mortgages he gave Creditor-Investors were never recorded somehow negates his falsification of the notary seals on those same mortgages.

78. However, <u>Fry</u> is not merely distinguishable; it is wrong. The purpose of § 727 is to weed out scammers and con artists from the pool of honest but unfortunate debtors the bankruptcy system is designed to serve. *See* <u>In re Garman</u>, 625 F.2d 755, 760 (7th Cir. 1980) ("We believe the Act was meant to discharge only the honest debtor from his debts . . . and that the Act should be liberally applied to protect the bankrupt only in those cases where there is no intent to violate its provisions."). A narrow, constricting approach to interpreting the statute like that adopted by the <u>Fry</u> court is counterproductive. It permits debtors to escape the consequences of their dishonest acts and obtain a discharge so long as they concede their frauds in the bankruptcy.

79. Many courts have rejected this reading and, instead, taken the approach to keeping fraudulent debtors from obtaining a discharge. *See, e.g.* <u>Vara v. McDonald</u>, 29 F.4th 817 (6th Cir. 2022) (affirming summary judgment for United States Trustee under 727 where banker-debtor failed to account in his schedules for unauthorized loan taken out from customer to pay personal

25

expenses that was never paid back and line of credit opened by debtor in another customer's name unbeknownst to the creditor that was also used to pay the debtor's personal expense); <u>Carbon Inv. Partners, LLC v. Bressler (In re Bressler)</u>, Nos. 18-13098 (MG), 19-01317 (MG), 2020 Bankr. LEXIS 1232 (Bankr. S.D.N.Y. Apr. 29, 2020) (granting summary judgment to United States Trustee on 727(a)(3) claim where debtor wiped his computer of important and pertinent files). This court should follow suit to maintain the integrity of the bankruptcy system and best serve its mission of preserving the discharge for the honest but unfortunate debtor.

80.    The Sixth Circuit has not ruled on the proper standard under section 727(a)(3). Accordingly, the United States Trustee urges the Court to reject the <u>Fry</u> court's extraordinary burden of showing that a falsification of a record makes it "impossible" to ascertain a debtor's financial condition or business transactions. Instead, it should adopt the Ninth Circuit's position. Under that test, a plaintiff has the burden to show the defendant has not "present[ed] sufficient written evidence which will enable his creditors reasonably to ascertain his present financial condition and to follow his business transactions for a reasonable period in the past." <u>Phillips v. Bourget (In re Bourget)</u> 176 B.R. 25 (Bankr. C.D. Calif. 1994) quoting <u>In re Cox</u>, 904 F2d 1399, 1401 (9th Cir. 1990).

81.    In <u>Bourget</u>, a building contractor remodeling a home for the plaintiffs was unhappy with what he perceived as an undue delay by the plaintiffs in making installment payments under the contract, so he forged additional digits on the payment amounts for invoices he received and charged the plaintiffs the higher amounts to "make up" for his "inconvenience." <i>Id</i>. at 27–28. After the contractor quit the project before finishing, the plaintiffs pursued a damages case against him through arbitration proceedings and discovered the forged invoices. <i>Id</i>. at 28. After the contractor filed for chapter 7 relief, the plaintiffs sued to deny his discharge under § 727(a)(3). <i>Id</i>.

82.     The court in <u>Bourget</u> sided with the plaintiffs and denied the contractor's discharge under § 727(a)(3) because the contractor falsified business records. "The integrity of Defendant's documents were crucial to Plaintiffs' ability to receive the benefit of their contract with Defendant." *Id*. The contractor tried to justify his conduct by arguing that (1) the plaintiffs had not been making installment payments in a sufficiently timely manner and (2) because the total contract amount was fixed, his falsifications would not have led the plaintiffs to pay more than they planned. *Id*. The court did not find these arguments persuasive and held that he had not sufficiently justified his actions, as the contractor had contractual rights and remedies he could have used if the plaintiffs were truly delinquent, and the plaintiffs should have been able to rely on his documents. *Id*.

83.     Similar to the contractor in <u>Bourget</u>, the Defendant falsified documents by affixing Forged Digital Notaries on purported mortgages thus misrepresenting their validity. *See* <u>Bourget</u>, 176 B.R. at 27-28; (Compl. ¶¶ 41-63, ECF No. 1.) The Defendant in this case also provides a similar justification: that the forgeries did not make it more difficult for the Creditor-Investors and Trustee to ascertain the Defendant's financial condition and material business transactions because the Creditor-Investors already knew that the mortgages were unenforceable by virtue of their being unrecorded, so learning that they were also invalid because of forgeries would not contribute a great deal to their understanding. Docket 10 at 16 (¶ 48). Like the contractor in <u>Bourget</u>, both argue that their falsifications were harmless. However, here, as in <u>Bourget</u>, the Creditor-Investors' ability to benefit from the mortgage deals depended on the mortgages being valid. They should have been able to rely on the Defendant's representations and should not be expected to engage in forensic handwriting analysis. The Defendant's forgeries were unjustified and seriously hampered the ability of Creditor-Investors and the Trustee to ascertain the validity of his business transactions

and his financial condition. The Court should, like the court in <u>Bourget</u>, deny him the privilege of a discharge.

84.     The Defendant asserts that the United States Trustee has not satisfied the <u>Neff</u> requirement insofar as he has not shown why the Trustee and Creditor-Investors needed to know that the notaries on the mortgages were forged. Docket 10 at 16 (¶ 50); <u>McDermott v. Neff</u>, 2015 Bankr. LEXIS 4361 (Bankr. N.D. Ohio 2015). In <u>Neff</u>, the court denied the United States Trustee's motion for summary judgment on a claim under § 727(a)(3) because the only evidence the United States Trustee offered was that the debtor did not respond to requests for information during a random debtor-audit. Such audits were implemented after BAPCPA and were conducted by outside auditors, not by staff in the Office of the United States Trustee. Although the United States Trustee attempted to enforce compliance with the audit, his complaint provided "no evidence regarding the types of transactions about which the auditor sought recorded information or how the missing recorded information might enable Defendant's actual financial condition or business transactions to be ascertained." <u>Neff</u>, 2015 Bankr. LEXIS 4361, at *6.

85.     This case is easily distinguishable from <u>Neff</u>. Here, the debtor admitted to using Digital Notary Forgeries, effectively falsifying and mutilating records he used in business transactions with Creditor-Investors. The United States Trustee has identified what information was missing and how it would have allowed the Defendant's financial condition and business transactions to be ascertained. Moreover, the Complaint satisfies the <u>Neff</u> requirement by highlighting that the Trustee and Creditor-Investors would not have known that the mortgages were invalid under Ohio law but for the revelations about the Digital Notary Forgeries. Docket 1 at 14–15 (¶¶ 59-61).

86.     The Defendant argues in paragraph 41 of the Motion that Creditor-Investors already

28

knew that the mortgages were not properly recorded and thus subject to the Trustee's avoidance powers under § 544 just as if they were invalid. Docket 10 at 14 (¶ 41). Therefore, knowing about the forged notaries would not be necessary because the Trustee and Creditor-Investors already knew that the purported mortgages were vulnerable and unenforceable.

87.     Section 727(a)(3) is silent as to when a debtor's acts of falsification of records impairs the ability to "ascertain" a debtor's financial condition or business transactions. In fact, many months passed before Creditor-Investors became aware that the Defendant had used the Digital Notary Forgeries and had not followed through on his representations that he would record their mortgages. Docket 1 at 10 (¶¶ 39-40), 17 (¶¶77-78). The Defendant's coming clean about one dishonest act (failing to record the mortgages after representing he would do so) should not entitle him to evade another dishonest act (falsifying records). The bottom line is that the Creditor-Investors were unaware of the Defendant's bad acts at the time he gave them the Digital Notary Forgeries, and for a considerable amount of time thereafter. Some parties including the Trustee did not discover the records were falsified until after the Rule 2004 Examination, *i.e.*, six months after the Petition Date.

88.     In a similar vein, the Defendant asserts that the United States Trustee has not sufficiently plead the materiality of the transactions because he did not allege that the Creditor-Investors with invalid mortgages would have had security interest in the properties' equity had the mortgage instruments been valid. Docket 10 at 1 (¶ 49). The Defendant's arguments that the properties are not sufficiently valuable to support equity positions for the Creditor-Investors he gave mortgages to is yet another instance of the Defendant relying on one dishonest act to avoid the penalty for another dishonest act.  The Defendant is essentially arguing that because he offered to give Creditor-Investors mortgage liens on properties for amounts exceeding the properties' fair

market value (and/or gave multiple unrecorded mortgages on the same property), it should not matter, as a matter of law, that he also falsified the mortgage documents he gave them. Such an argument fails on its face.

89.     Finally, the Defendant suggests that the Trustee's failure to join in the United States Trustee's Complaint supports a dismissal. However, whether the Trustee joins in the Complaint is entirely irrelevant. Section 727(c)(1) provides: "The trustee, a creditor, *or* the United States Trustee may object to the granting of a discharge under subsection (a) of this section." 11 U.S.C. § 727(c)(1) (emphasis added). The United States Trustee fulfills his role as "watchdog" of the bankruptcy system partly to alleviate costs to bankruptcy estates of prosecuting actions that are unlikely to yield a return to creditors, but which serve the public interest. *See* Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.), 898 F.2d 498, 500 (6th Cir. 1990) (describing the United States Trustee as a "watchdog"). The United States has the authority to bring an action under § 727(a)(3) with or without the assistance of creditors or the Trustee. Notably, Creditor-Investors have filed eight separate suits against the Defendant under § 523 seeking to prevent the discharge of his debts obtained through fraud.

90.     For the reasons stated above, the Court should deny the Defendant's request to dismiss count two of the Complaint.

## COUNT THREE

91.     The Defendant argues that the court should dismiss count three of the Complaint because it lacks a sufficient factual basis from which to infer that the Defendant's failure to list Dope Ideas LLC and North Shore Ecom LLC on its schedules was done with knowledge and fraudulent intent. Docket No. 10 at 10 (¶¶ 26-27).

92.     The Defendant begins his argument by alleging that the United States Trustee did

not plead any facts to support its claim of a false oath. Docket No. 10 at 10 (¶¶ 26-27). The Defendant is wrong, and the United States Trustee appropriately pled a *prima facie* case for false oath. The Complaint contains allegations that the Defendant is the sole member of both Dope Ideas LLC and North Shore Ecom LLC. Docket 1 at 5 (¶¶ 27-28). The United States Trustee also alleges that the Defendant failed to include both of them in his schedules. Docket 1 at 5 (¶ 26). Since he must have been aware that he owned both of these entities, it is reasonable to expect him to include them on his schedules. His failure to do so in spite of this knowledge implies that the failure was intentional, an evidentiary burden properly reserved for trial.

93.     The Defendant argues that because he disclosed seventeen other entities that he owns as well as three additional entities that he shares with his wife, there is no reason other than accident that he would fail to disclose these two entities. Docket No. 10 at 10 (¶ 28). But the disclosure of some assets is irrelevant to the question of why the Defendant failed to disclose other assets. One might reasonably infer that the inclusion of some entities and not others is suspicious by itself. Under such circumstances, discovery is appropriate; the Defendant therefore is not entitled to relief under Rule 12(c).

94.     While the plaintiff does have the burden to show that a debtor has made a false oath under § 727(a)(4)(A), the plaintiff is not required to overcome a presumption that a seeming material omission is an accident. Similarly, the plaintiff has no duty to establish a motive for the false oath. The plaintiff simply must demonstrate that the debtor knowingly or fraudulently made a false oath. In re McNamara, 89 B.R. 648, 654 (Bankr. N.D. Ohio 1988). The United States Trustee has done this simply by alleging that the Defendant owned these two LLCs, failed to schedule them, and did so knowingly because he must have known that he owned them. Docket 1 at 5–6 (¶¶ 26-31). The Defendant is also wrong to argue that the United States Trustee is

inappropriately expanding the statute to cover all omissions, even harmless or unintentional ones. The United States Trustee is not altering or expanding the standard for § 727(a)(4)(A). Rather, he simply plead the necessary facts to satisfy the existing standard.

95. The Defendant tries to distinguish this case from <u>Keeney v. Smith</u>, a case the United States Trustee cited in his Complaint. Docket 10 at 11 (¶¶ 31-32); Docket 1 at 6 (¶ 31). While the facts of <u>Keeney</u> are a little bit different from this case in that <u>Keeney</u> involved a debtor's failure to schedule properties he transferred to his parents despite continuing to live at the properties and pay the mortgage, the logic of the court's decision still applies here. *See* <u>Keeney v. Smith (In re Keeney)</u>, 227 F.3d 679 (6th Cir. 2000). The court in <u>Keeney</u> held that the debtor's discharge should be denied under § 727(a)(4)(A) because, since the debtor "held a substantial beneficial interest in the properties," the bankruptcy court could reasonably infer that the debtor knew about the properties and intentionally chose not to schedule them or exercised a reckless disregard for the truth when not scheduling them. *Id*. at 686. Importantly, the court in <u>Keeney</u> made clear that "[c]ourts may deduce fraudulent intent from all the facts and circumstances of a case." *Id*. That is precisely what the United States Trustee is doing (and asking the court to do) here—to make the reasonable inference that the Defendant either knowingly or with a reckless disregard for the truth made a false oath when he chose not to include interests in entities that he must have been fully aware he owned.

96. The Defendant cites <u>Khalil v. Developers Surety & Indemnity Co.</u> for the proposition that a reckless omission by a debtor of an asset from his schedules does not itself amount to a false statement under § 727(a)(4)(A). *See* <u>Khalil v. Developers Sur. & Indem. Co. (In re Khalil)</u>, 379 B.R. 163 (B.A.P. 9th Cir. 2007); Docket No. 10 at 11–12 (¶ 33). However, this argument demonstrates a misunderstanding of the <u>Khalil</u> decision. In <u>Khalil</u>, the Bankruptcy

Appellate Panel for the Ninth Circuit held that while recklessness itself may not be enough to establish intent, it can be probative of intent and "a court *may* find the requisite intent . . . from a debtor's reckless indifference to or disregard of the truth." *Id*. at 173 (quoting <u>Fogal Legwear of Switz., Inc. v. Wills (In re Wills)</u>, 243 B.R. 58, 64 (B.A.P. 9th Cir. 1999)). Also, and just as importantly, a court can find intent "where there has been a pattern of falsity" on the part of the defendant. *Id*. Thus, the United States Trustee is well within the bounds established by <u>Khalil</u> when it infers that the Debtor intended to make a false oath or was reckless with regard to the truth when he did not disclose the two LLCs, since there has been a pattern of dishonesty in this case (as is demonstrated throughout the Complaint as well as the complaints filed by Creditor-Investors).

97.     For the reasons stated above, the Court should deny the Defendant's request to dismiss count three of the Complaint.

## COUNT FOUR

98.     The Defendant argues that count four of the Complaint should be dismissed because the United States Trustee has not pled sufficient facts to suggest that the Defendant is inexplicably insolvent. More specifically, the United States Trustee's reliance on the Defendant's failure to ascertain the values of the claims by the Creditor-Investors is misplaced because such claims are difficult to value. Docket 10 at 12–13 (¶¶ 35-39). The Defendant's assertions are wrong. The Complaint contains sufficient specific facts to make clear that the Defendant is unable to meet his actual liabilities and has not explained why.

99.     As the plaintiff, the United States Trustee must undertake the discovery-intensive process of estimating the values of uncertain claims to ascertain the actual extent of the Defendant's insolvency. A plaintiff objecting to discharge under § 727(a)(5) "must first identify assets that the debtor owned at one time and subsequently claims to no longer possess." <u>Vara v.</u>

McDonald, 29 F.4th 817, 822 (6th Cir. 2022). Specifically, the plaintiff must show "substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy that are no longer available for creditors." Strzesynski v. Devaul (In re Devaul), 318 B.R. 824, 839 (Bankr. N.D. Ohio 2004). Such "assets" frequently include *loan proceeds*. Because section 727(a)(5) itself contains no designated "lookback" period, most courts (include the Sixth Circuit) interpret the "not too far removed from the bankruptcy" requirement liberally and make evaluations depending on the facts of the case. *See* McDonald (court found monies loaned to the debtor four and five years before the petition date is not too remote). *See also* In re D'Agnese, 86 F.3d 732 (7th Cir. 1996) (permitting a lookback of nine years prepetition). Should the plaintiff identify such assets, then "the burden shifts to the debtor to offer a satisfactory explanation for the loss of the identified assets." McDonald, 29 F.4th at 822. Such an explanation "must contain more than vague guesses and conclusory statements." *Id*. at 823 (citations omitted). A debtor who fails to adequately explain a deficiency in assets will be subject to strict liability because § 727(a)(5) has no intent requirement. *Id*. (quoting Baker v. Reed (In re Reed), 310 B.R. 363, 368 (Bankr. N.D. Ohio 2004)).

100.     Here, the missing assets are the funds the Creditor-Investors funds loaned to the Defendant. Docket 1 at 6–9 (¶ 32). The Complaint lists 52 people from whom the Defendant or his 100% Corporate Entities solicited and received funds in exchange for promissory notes secured by mortgages and sometimes by purported mortgages containing Digital Notary Forgeries. Docket 1 at 6–10 (¶¶ 32-37, 39).

101.     The Defendant listed $277,500 of total assets and $280,274 of total liabilities on his schedules, with a trivial deficit of $2,774. Bankr. Case No. 22-10571-(AIH), Docket No. 1 at 8, 10–16, 19–49. However, this number does not reflect the Defendant's true liabilities and deficit

because it excludes the funds he controlled from loans made by Creditor-Investors.

102. The amounts in question are not mere "bells and whistles" damages like the Defendant claims, but are specific values based on the promissory notes Creditor-Investors gave the Defendant through his 100% Corporate Entities. Given that fewer than half of the victims of the Defendant's investment scheme have filed suit, the actual amount of funds that Creditor-Investors lent to the Defendant through the 100% Corporate Entities greatly exceeds the figures in the public record of this case.

103. The Defendant argues that because the United States Trustee did not ask the Defendant to explain his losses at the 341 meeting, its continuation, or the 2004 examination, the United States Trustee does not have a real case on this count. Docket No. 10 at 13 (¶ 39). This is inaccurate. First, the United States Trustee made clear on the record as late as the Rule 2004 Examination that he reserved the right to depose the Defendant at a later date. Second, there were other matters that the United States Trustee was concerned with at these events, especially the Forged Notary Seals. The United States Trustee should not be constrained to choose which issues he can pursue based on what questions he asked a debtor about at a 341 meeting or a 2004 examination.

104. Finally, this case presents a perennial problem for the United States Trustee, namely how to conduct investigations and prosecute cases under section 727(a)(5) when a debtor, for whatever reason, omits to schedule or value claims that would otherwise demonstrate "substantial and identifiable assets that the debtor owned at a time not too far removed from the bankruptcy." Devaul, 318 B.R. at 839. Debtors and other interested parties frequently expect that the United States Trustee to be able to quickly identify cash assets for which there are limited public records, and often no records. The Defendant questions why this should not have been readily ascertained

by the Rule 2004 exam, let alone the Section 341 Meeting. Docket 10 at 7–8 (¶ 19), 13 (¶ 39). In fact, such investigations are intensive, and must be conducted congruently with other administrative duties. Such investigations necessarily must begin not with debtors prone to minimize his liabilities, but *with creditors*—oftentimes, as in this case, dozens of individuals with few resources, limited access to legal process, most of whom have reasonably conceded that they will likely never recover the funds they lent. Interviewing such creditors is crucial to understanding just how much principal dissipated by debtors like the Defendant must be required to explain.

105.    The United States Trustee has sufficiently pled its allegations against the Defendant under § 727(a)(5). He pled that the Defendant was given a large though uncertain sum of money by various investors in exchange for promissory notes supposedly secured by mortgages on real property owned by the Defendant's 100% Corporate Entities. (Compl. ¶¶ 67-78, ECF No. 1.) The Defendant has not clarified where this money went or for what it was used. Precisely by filing the Complaint did the United States Trustee put the Defendant on notice that he has the burden to satisfactorily explain this deficiency.

106.    Further, given the potential scale of these claims and the difficulty in valuing them, the United States Trustee is entitled to discovery to audit the Defendant's finances and develop a better picture of his real estate investment scheme. This discovery should be wide in scope and should be allowed to include information and transaction from not less than five years before the petition date, consistent with the Sixth Circuit's holding in McDonald. *See* McDonald, 29 F.4th at 822–23.

107.    For the reasons stated above, the Court should deny the Defendant's request to dismiss count four of the Complaint.

**WHEREFORE** the United States Trustee respectfully requests that the Court enter an

order holding that the Complaint states a sufficient claim for relief under 11 U.S.C. § 727(a)(2)(A), (3), (4), and (5). and denying the Motion with prejudice, and for such further relief as may be necessary under law and equity.

Respectfully submitted,

Andrew R. Vara
United States Trustee, Region 9

by:  */s/ Scott R. Belhorn*
Scott R. Belhorn (#0080094)
Trial Attorney
Office of the U.S. Trustee
H.M. Metzenbaum U.S. Courthouse
201 Superior Ave. East
Suite 441
Cleveland, Ohio 44114-1240
Phone (216) 522-7800 ext. 260
Fax (216) 522-7193
Scott.R.Belhorn@usdoj.gov

## CERTIFICATE OF SERVICE

I, Scott R. Belhorn, hereby certify that the foregoing Motion was electronically transmitted on or about December 8, 2022, via the Court's CM/ECF system to all parties listed on the Court's Electronic Mail Notice List, including:

- Thomas W. Coffey    tcoffey@tcoffeylaw.com
- United States Trustee    (Registered address)@usdoj.gov
- Scott R. Belhorn ust35    Scott.R.Belhorn@usdoj.gov

*/s/ Scott R. Belhorn*
Scott R. Belhorn

37