The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on June 13, 2023, which may be different from its entry on the record.

IT IS SO ORDERED.

Dated: June 13, 2023



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| MATTHEW M. MOTIL, | ) | Case No. 22-10571 |
| Debtor. | ) | |
| | ) | Judge Arthur I. Harris |
| | ) | |
| ANDREW R. VARA, | ) | Adversary Proceeding |
| United States Trustee, | ) | No. 22-1084 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MATTHEW M. MOTIL, | ) | |
| Defendant. | ) | |

MEMORANDUM OF OPINION[1]

In this adversary proceeding, the U.S. Trustee seeks denial of the debtor

Matthew M. Motil's discharge under various provisions of 11 U.S.C. § 727.  Over

the course of five days, the Court held a trial before taking the proceeding under

_____

[1] This Opinion is not intended for official publication.

advisement.  For the reasons that follow, the U.S. Trustee has established the elements for denial of the debtor's discharge by a preponderance of the evidence as to two of the six claims for relief in the U.S. Trustee's amended complaint.  Those two claims are Amended Count 1(B), involving the prepetition transfer of a 2009 Ford F-150 with the intent to hinder, delay, or defraud creditors under § 727(a)(2)(A), and Amended Count 3(B), the making of false oaths concerning the same vehicle under § 727(a)(4)(A).  As to the other four claims for relief, the U.S. Trustee has failed to establish the elements for denial of the debtor's discharge by a preponderance of the evidence.

## JURISDICTION

An objection to discharge is a core proceeding under 28 U.S.C. § 157(b)(2)(J).  This Court has jurisdiction over core proceedings under 28 U.S.C. §§ 157(a) and 1334 and Local General Order 2012-7 by the United States District Court for the Northern District of Ohio.

## PROCEDURAL HISTORY

On March 7, 2022, Dr. Matthew M. Motil (the debtor) filed a voluntary petition under Chapter 7.  Case No. 22-10571, Docket No. 1.  After obtaining two extensions of time without objection, the U.S. Trustee filed a complaint objecting to the debtor's discharge, commencing this adversary complaint on September 30,

2

2022. Adv. Proc. No. 22-1084. On November 17, 2022, the debtor filed an amended motion to dismiss the adversary complaint in its entirety (Docket No. 10), to which the U.S. Trustee responded with a brief opposing the motion. Docket No. 14. On December 14, 2022, the debtor filed a reply brief (Docket No. 18), and the Court took the matter under advisement without oral argument.

On January 13, 2023, the Court issued a Memorandum Opinion and Order denying the debtor's motion to dismiss in part and granting the U.S. Trustee leave to file an amended complaint by February 3, 2023. Docket Nos. 21–22. On January 20, 2023, the Court granted the U.S. Trustee until February 17, 2023, to file an amended complaint. Docket No. 33. On February 14, 2023, the U.S. Trustee filed a motion for leave to file an amended complaint and attached a proposed amended complaint to the motion along with numerous supporting documents. Docket No. 37. On February 21, 2023, the Court approved an agreed order deeming the amended complaint filed as of February 14, 2023. Docket No. 39.

In the amended complaint, the U.S. Trustee alleges six grounds for denying the debtor's discharge.

In Amended Count 1(A), the U.S. Trustee alleges the debtor intended to hinder, delay, or defraud creditors under § 727(a)(2)(A) by transferring real

3

property located at 3593 West 50th Street in Cleveland (the West 50th Street property) either individually or using entities as the debtor's "alter ego," or by concealing or converting the proceeds of the sale of the property.

In Amended Count 1(B), the U.S. Trustee alleges the debtor intended to hinder, delay, or defraud creditors under § 727(a)(2)(A) by transferring the title of a 2009 Ford F-150 (the F-150) to his spouse, Ms. Amy Motil, shortly before bankruptcy and by concealing the transfer on his filings and at the meeting of creditors.

In Amended Count 2, the U.S. Trustee alleges the debtor falsified or mutilated recorded information by improperly notarizing mortgages, so that his financial condition and transactions could not be properly ascertained under § 727(a)(3).

In Amended Count 3(A), the U.S. Trustee alleges that the debtor made a false oath by failing to disclose a 100 percent membership/ownership interest in a limited liability company (L.L.C.) called BUYCLE114, L.L.C. (BUYCLE114), thereby violating § 727(a)(4)(A).

In Amended Count 3(B), the U.S. Trustee alleges that the debtor made a false oath by failing to disclose the prepetition, gift, transfer, or sale of the F-150

4

on the debtor's Statement of Financial Affairs (SOFA), the amended SOFA, and at the meeting of creditors, thereby violating § 727(a)(4)(A).

In Amended Count 4, the U.S. Trustee alleges the debtor failed to explain satisfactorily the loss or dissipation of assets under § 727(a)(5) both with respect to the amount of investor funds that exceeded the purchase price of the debtor's real properties and with respect to the loss of funds involved in the transfer of the F-150.

On April 4–5, 12–13, and 17, 2023, the Court held a trial on the U.S. Trustee's complaint to deny the debtor's discharge. Nine witnesses testified:

- Ms. Kristen Kish (a former employee of the debtor);

- Lt. Col. Eric Chase,

- Dr. Kenneth Lynch, III, M.D.,

- Mr. Scott Senseny, and

- Mr. Brian Niec (all former investors with and current creditors of the debtor);

- Mr. Ryan Thomas, Esq. (an attorney representing current creditors in proceedings against the debtor);

- Ms. Amy Motil (the debtor's spouse);

- the debtor, and

- Ms. Catherine Lowman, Esq. (a bankruptcy auditor with the U.S. Trustee's office).

5

The Court admitted without objection U.S. Trustee Exhibits 1 through 71, 74 through 77, 83 through 100, and 102 through 138. The Court also admitted without objection Defendant Exhibits A through I and K through R, as well as Deposition Exhibits A through H to Exhibit P and two unlettered exhibits (the Right to Sell Agreement and an email chain between the U.S. Trustee and the debtor's attorney).

After closing arguments and after the Court had taken this proceeding under advisement, the debtor filed amended schedules and statements in the debtor's main case. Case No. 22-10571, Docket Nos. 137–42. Because no party has asked the Court to reopen the trial record, the Court will not consider the amended schedules and statements filed on May 11, 2023, in rendering its decision. Nevertheless, none of these filings, had they been considered, would have altered the Court's determination as to any claims or defenses in this adversary proceeding.

FINDINGS OF FACT

The findings of fact contained in this Memorandum of Opinion reflect the Court's weighing of the evidence, including the credibility of the witnesses. "In doing so, the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a

6

transcript does not convey tone, attitude, body language or nuance of expression."
*In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically
mentioned in this decision, the Court considered the testimony of all the trial
witnesses, exhibits admitted into evidence, and any stipulations. Unless otherwise
indicated, the following facts were established at trial by a preponderance of the
evidence.

### 2015–Summer 2019: The Debtor's Entry into Real Estate

The debtor holds a bachelor's degree in mechanical engineering from the
University of Toledo and a Master's in Business Administration from Ottawa
University in Ottawa, Kansas. In 2015, the debtor obtained a Ph.D. in business
administration from Walden University under the direction of his supervisor,
Dr. Cheryl Lentz, researching the causes of burnout in the construction industry.

In 2015, the debtor bought his first investment property in Parma, Ohio, a
duplex on Velma Avenue. To help manage the property, the debtor created North
Shore Equity Management, L.L.C. (NSEM). Changing careers, the debtor became
licensed as a realtor in February 2016 and formed North Shore Equity Sales,
L.L.C. (NSES) to help manage his sales of real estate. Afterwards, the debtor
worked for other realtors helping investors buy investment properties, as well as
maintaining and renovating his own rental properties. In the beginning, the debtor

7

apparently took investments from close friends and relatives. For example, on October 31, 2018, INVCLE150, L.L.C. (INVCLE150), an entity controlled by the debtor, granted a mortgage on real estate to the debtor's doctoral advisor, Dr. Lentz, in exchange for $57,749.32. The mortgage was promptly recorded on November 1, 2018. Ex. 74 at 69–72.

Ms. Kristen Kish began to work for entities controlled by the debtor in October 2018 and continued until February 4, 2020. Ex. 46 at 4. Early in Ms. Kish's tenure, the debtor asked Ms. Kish to become a notary public. The debtor testified that his motivation in asking Ms. Kish to do this was to avoid the inconvenience of having to schedule an appointment or wait for a notary public to become available.

On November 2, 2018, the debtor and two partners, through an entity named ALV Twinsburg, L.L.C., purchased a gym in Twinsburg from TTV's Second L.L.C. using a cognovit note and assumed the gym lease. Compl. 1–15, *TTV's Second, L.L.C. v. ALV Twinsburg, L.L.C.*, No. CV-21-944682 (Cuyahoga Cnty. Ct. Com. Pl. Mar. 3, 2021). The debtor personally guaranteed the notes and the lease. *Id.* at 13–15; Ex. 121 at 70–72. A month later, INVCLE150 bought a twenty-eight unit apartment complex at 4027 Rocky River Drive, in Cleveland (the Rocky River Drive apartments), using $845,000 in funds loaned by Sharestates Investments,

8

L.L.C. (Sharestates).  Case No. 22-10571, Proof of Claim No. 43-2.  The debtor

hired a new property management company to manage the Rocky River Drive

apartments.  In December 2018, Ms. Kish passed the notary public exam and

began notarizing documents for the debtor.

On March 22, 2019, the debtor negotiated to buy a portfolio of ninety-four

properties in and around Mansfield.  Case No. 22-10571, Proofs of Claim 42-2, at

1; 44-2, at 1.  The debtor created two L.L.C.s, NSEM Mansfield 1 and NSEM

Mansfield 2, each of which represented a portion of the property portfolio.

Sharestates financed the properties in NSEM Mansfield 1 for $660,000 and the

properties in NSEM Mansfield 2 for $1,145,000. Case No. 22-10571, Proofs of

Claim Nos. 42-2, at 1, 44-2, at 1.  The loans from Sharestates were secured by

recorded mortgages and included the debtor's personal guarantees.  Case No. 22-

10571, Proofs of Claim 42-2; 43-2; 44-2.  In the summer of 2019, the debtor began

to renovate a property in Los Angeles on Dumetz Avenue in order to resell it.

NSES made a down payment of $134,321.67 on the property to Alex Low on

August 29, 2019.  Ex. 114 at 116.  The debtor gave Mr. Low a mortgage of

$412,000 and later sold the Dumetz Avenue property for more than $800,000.

9

*Fall of 2019 to 2021: Improper Notarization and Failure to Record*

From the fall of 2019 to 2021, the debtor's real estate business included soliciting funds from private investors. Before and during this period, from approximately 2017 to 2020, the debtor produced 147 episodes of a podcast on real estate and investment topics, called *The Cash Flow King*. Ms. Kish, an employee of the debtor, testified that one purpose of the podcast was to attract investors. The debtor also authored a book titled *Man on Fire: Lessons from a Perpetual Burnout on Creating Alignment for Success*. He also advertised his services on websites he owned or controlled, such as drmattmoil.com and mariepaul.com, to encourage investment in Ohio real estate properties. A typical example encouraged readers to "use real estate investing to fire their bosses forever!" Ex. 2 at 2.

During the trial, the debtor and his attorney at times took exception to the description of these individuals as "investors." The Court notes that one of the debtor's lengthy emails to these individuals has as its subject "Investor Update — March 2021." Ex. K at 1. For purposes of this decision, the precise description of these creditors is irrelevant.

Many potential investors responded to these advertisements. Both Dr. Lynch and Mr. Senseny testified that they found the debtor at least in part by listening to his podcast. Lt. Col. Chase testified that he considered the debtor an

10

expert in part based on his podcast, website, and publications. Others such as Mr. Niec were referred by friends or acquaintances. Lt. Col. Chase testified he talked with another investor with the debtor, Phil DuChamp. Altogether, the U.S. Trustee identified at least fifty-three of these potential investors who decided to invest funds in the debtor's enterprises. Am. Compl. 12–14. However, the investors did not invest funds directly with the debtor, but rather through entities the debtor controlled. Indeed, at all times relevant to this proceeding the debtor never owned any real property in his own name, including his family's residence.

The extent of due diligence exercised by private investors varied according to their experience in real estate investing. Lt. Col. Chase and Dr. Lynch testified they did not seek out or purchase private lender insurance, did not employ title companies to research the properties in which they were investing, and did not ask to examine the books and records belonging to the debtor or to the L.L.C.s with which they were investing. Mr. Senseny testified he may have performed a title search for investment properties but was unsure which company he used. Mr. Niec also used a title company recommended by the debtor, which recorded the title for him without raising the issue of not being able to record a digitally produced mortgage. Ex. 30 at 1.

11

Some of the investors testified they did not inspect the properties that would serve as security for their loans.  Mr. Senseny, however, testified that he did inspect the properties and thought they would be sufficient collateral.  And on April 28, 2020, Dr. Lynch asked the debtor if he offered a way to "objectively assess LTV [long-term value] of each property?"  Ex. 57 at 17 (extra space removed).  Lt. Col. Chase testified that his due diligence included speaking with an investor already familiar with the debtor.

During this period from the fall of 2019 to 2021, the debtor often fell into the same pattern.   First, numerous mortgages the debtor signed during this period exhibited problems with the notarization of his signature, beginning with the mortgage the debtor gave Mr. Martin M. Weiss on August 13, 2019.  Ex. 44 at 1.  Ms. Kish testified that she did not notarize the debtor's signature on the mortgages represented in Exhibits 9 through 42 and 44, and that the debtor used an electronic copy of her notary seal and signature to give the impression that his signature on the mortgages were correctly notarized.  Ms. Kish and the debtor both testified that Ms. Kish would notarize mortgages that had not been signed by the debtor, both when the debtor was present in the office with Ms. Kish, and when he was not.  This process began soon after Ms. Kish obtained her notary seal.  Ms. Kish did not explain to the debtor that notarizing unsigned documents was not permitted

12

because she felt that the debtor was her employer and had paid for her training, and so was not to be questioned. The debtor testified that he was not aware that Ms. Kish was not legally permitted to notarize unsigned mortgages. Ms. Kish testified she retained possession of her notary stamp at all times and did not give the debtor permission to use it.

Besides improperly notarizing his signature on mortgages, the debtor often promised investors first liens on properties in exchange for short-term loans. For example, during a phone call on January 29, 2019, the debtor told Lt. Col. Chase that he gives private investors first lien mortgages, records the mortgages, and names investors as co-insureds on insurance policies covering the relevant properties. Ex. 51 at 5–6. This occurred before Lt. Col. Chase invested with the debtor. Further, on August 22, 2019, the debtor promised Lt. Col. Chase by email that the investor would receive a first lien on property at 3318 Hearthstone Road in Parma, Ohio (the Hearthstone Road property), again before Lt. Col. Chase's spouse invested in the property. Ex. 54 at 2. However, the debtor had already granted a mortgage on the property to another investor, Mr. Weiss, on August 13, 2019. Ex. 44 at 1. The debtor also reassured Mr. Kyle Collette that he would get a first lien position on the West 50th Street property. Ex. 136 at 5. The debtor routinely granted mortgages with the following provision: "(4) MORTGAGOR

13

covenants and agrees not to create, nor permit to accrue, upon all or any part of the MORTGAGED PREMISES any debt, lien or charge which would be prior in lien or payment to the lien of this Mortgage." Exs. 9 at 2; 10 at 2; 11 at 2; 12 at 2; 13 at 2; 14 at 2; 15 at 2; 16 at 2; 17 at 2; 18 at 2; 19 at 2; 20 at 2; 21 at 2; 22 at 2; 23 at 2; 24 at 3; 25 at 2; 26 at 2; 27 at 3; 28 at 2; 29 at 2; 30 at 2; 31 at 2; 32 at 2; 33 at 2; 34 at 2; 35 at 2; 36 at 2; 37 at 2; 40 at 2; 41 at 2; 43 at 3; 44 at 2, 55 at 7; 56 at 7.

In addition, the debtor also failed to record mortgages, even while promising investors that he would do so. For example, before Dr. Lynch invested with the debtor, the debtor told him that the "process" of investing including "fil[ing] the mortgage document with the county recorders [sic] office" after the investor sent funds and adding the investor as a beneficiary to the insurance policy. Ex. 57 at 2. The debtor never recorded the mortgages held by Dr. Lynch or added Dr. Lynch to the insurance policies. Exs. 55 at 11–13; 56 at 11–13. And because the debtor never provided Dr. Lynch an original copy of the mortgage, Dr. Lynch was not able to record the mortgage on his properties and had to file a *lis pendens* on each property instead. Dr. Lynch filed a *lis pendens* on the property at 574 West 4th Street in Mansfield, Ohio (the West 4th Street property) on December 11, 2020, about seven and a half months after receiving the mortgage on the property on April 24, 2020. Ex. 55 at 11–18. Dr. Lynch filed a *lis pendens* on

14

the West 50th Street property in Cleveland on December 16, 2020, also about seven and a half months after receiving the mortgage on April 24, 2020. Ex. 56 at 11–18.

Similarly, the debtor promised Mr. Collette that he would record the mortgage, and Mr. Collette repeatedly followed up with the debtor to obtain a copy of the recorded mortgage. Ex. 136. However, the debtor never recorded the mortgage he gave to Mr. Collette.

The debtor likewise told Lt. Col. Chase that "all our docs and stuff get recorded" when describing the process of investing. Ex. 51 at 6. When Lt. Col. Chase later asked the debtor why he had not yet received copies of recorded mortgages on his investment properties, the debtor responded that the "amazingly slow" county typically took three to four months to mail out copies of recorded mortgages. Ex. 54 at 3. This statement appears to be a complete fabrication by the debtor, as there was no evidence that the county was dilatory in mailing back copies of recorded documents, let alone that the debtor had actually delivered original mortgages to the county to be recorded for the benefit of Lt. Col. Chase. Lt. Col. Chase's mortgages on the property at 13410 Wainfleet Avenue in Cleveland (the Wainfleet Avenue property) and the property at 1172 Longmead Avenue in Cleveland (the Longmead Avenue property) were

15

never recorded. Exs. 49 at 6; 50 at 6. In the same way, Mr. Senseny requested original recordable mortgages from the debtor from September 1 to December 15, 2020, but the debtor never sent the documents as he had promised. Ex. 75 at 9–15. Mr. Senseny testified he was able to record one mortgage because of an inexperienced clerk in the recorder's office. *See* Ex. 74 at 43. In sum, the debtor never recorded the vast majority of the mortgages he gave investors on his properties. Exs. 9 at 1; 10 at 1; 11 at 1; 12 at 1; 13 at 1; 15 at 1; 17 at 1; 18 at 1; 19 at 1; 20 at 1; 21 at 1; 22 at 1; 23 at 1; 25 at 1; 26 at 1; 28 at 1; 29 at 1; 31 at 1; 33 at 1; 34 at 1; 35 at 1; 36 at 1; 37 at 1; 38 at 1; 39 at 1; 40 at 1; 41 at 1; 43 at 2.

Not recording the mortgages allowed the debtor to grant a series of mortgages on a single property that substantially exceeded the property's value with a low risk of being detected. And the debtor did this with many different properties. Ms. Lowman testified at trial that, based on her analysis of promissory notes, proofs of claim, and public records, that there were many properties against which the debtor borrowed funds that substantially exceeded the property's value. For example, the auditor appraised value of the Hearthstone Road property was $75,800 at its purchase, but the debtor borrowed $1,329,300 against the property after purchasing it and granted mortgages on it to nineteen investors. Ex. 128 at 4. While the appraised value of the property at 13529 Leroy Avenue in Cleveland

16

(the Leroy Avenue property) at the time of purchase was $55,900, the debtor borrowed $645,000 against the property after buying it, granting mortgages to twelve investors. Ex. 128 at 6. Similarly, the appraised value of the Rocky River Drive apartments at the time of purchase was $890,000, but the debtor borrowed $2,036,000 against the property after purchasing it, granting liens on the property to at least eight different investors. Ex. 128 at 7. The Wainfleet Avenue property had an appraised value of $25,300 at purchase, but the debtor received $406,000 from investors after the purchase of the property, granting mortgages to twelve different investors. Ex. 128 at 2.

The debtor kept to this pattern with respect to the West 50th Street property. Despite the appraised value of the property being $19,400, the debtor solicited $205,000 in investor funds after purchasing the property by granting mortgages against the property to at least seven investors. Ex. 128 at 10. On October 8, 2020, a property manager emailed Ms. Motil that the West 50th Street property had been left in a bad condition by tenants. Ex. A at 1. Despite this, the debtor mortgaged the property three more times in exchange for an additional $85,000 in investor funds, and none of the mortgages was recorded. Exs. 12 at 1, 13 at 1, 15 at 1. And the mortgage to ZIP Management on January 5, 2021, was given after

17

Dr. Lynch filed a *lis pendens* against the property on December 16, 2020.  Exs. 12 at 1, 56 at 11–13.

To explain why he did not record many mortgages, the debtor testified that, according to his understanding from his real estate classes, the mortgages would remain valid between him and his investors regardless of whether they were recorded.  The Court does not find this testimony to be credible.  While a mortgage may remain valid between the parties without being recorded, the debtor consistently broke his own promise in the mortgage not to encumber the property through other mortgages.  In addition, as a sophisticated real estate investor and broker, the debtor certainly knew that it would be much more difficult for him to solicit funds and promise a first place lien on real property when the property was already encumbered by a recorded mortgage.

*2019 to 2021: New Investors Fund the Debtor's Lifestyle,
Support the Debtor's Other Projects, and Pay Off Old Investors*

From 2019 to 2021, the debtor's major real estate entities, NSES and NSEM, funded the debtor's lifestyle, as well as financial shortfalls in ALV Twinsburg.  ALV Twinsburg functioned as the major entity through which the Twinsburg and Cleveland gyms were financed.  Of all the real estate L.L.C.s, only NSES and NSEM had bank accounts or credit cards in their names.  The other real estate L.L.C.s operated through NSES and NSEM.  Both entities funded personal

18

expenses for the debtor and his family.  For example, Ms. Motil had a Disney Chase card in her name for family use, even though Ms. Motil testified that she did not like credit cards and did not use them very much.  Ex. 85 at 1.  Ms. Motil testified that the Disney Chase card was used for both business and personal expenses but could not specify what proportion of the expenses on the card was business.  In 2019, the debtor's family account paid only $1,314.16 on the Disney Chase card, while NSES paid $218,460.90.  Ex. 127 at 1.  In 2020, NSES paid $92,736.55 on the Disney Chase card, NSEM paid $320, and the debtor's family account paid $4,112 on the card.  Ex. 127 at 1.  In 2021, NSES paid $11,490.03 on the Disney Chase card, the debtor paid $1,085.95, NSEM paid $222, and Alpha Legends Ventures, the holding company for the gyms, paid $400.  Ex. 127 at 1.  The debtor provided no credible explanation for why these business entities paid so much on a consumer credit account.

Similarly, NSES paid directly for what appear to be consumer expenses for the debtor and his family, as shown by the following.

- On May 7, 2019, NSES paid $7,806.41 to Marine Depot, categorized as office expenses.  Ex. 131 at 322.  Ms. Kish testified there was not an aquarium at the Marie Paul company, but the debtor had one in his home.

- On May 20, 2019, NSES paid $1,045.61 to Salty Critter, an aquarium store, categorized as office expenses.  Ex. 131 at 322.

19

- On May 29, 2019, NSES paid $3,197.35 to Disney Vacation Club via Check 2064. Ex. 131 at 27.

- On June 14, 2019, NSES paid $718.20 to a jewelry store, categorized as job materials. Ex. 131 at 294.

- On June 24, 2019, NSES paid $35 to Yosemite National Park, categorized as legal and professional fees. Ex. 131 at 296.

- On June 17, 2019, NSES made two payments of $3,750 to the Cleveland Cavaliers. Ex. 131 at 74.

- On July 1, 2019, NSES made payments totaling $90.31 to Cedar Point amusement park. Ex. 114 at 93.

- On July 8, 2019, NSES made two payments of $26.99 and $50 to Nintendo, categorized under "tools." Ex. 131 at 348.

- On September 27, 2019, the Chase Disney rewards card was charged a $12,356.41 fee for Disney World resorts. Ex. 85 at 49. NSES paid off $26,535.21 of charges, including the Disney fee, on October 22, 2019. Exs. 85 at 49, 114 at 143. Ms. Kish testified that she accompanied the debtor and his family to Disney World in October 2019, and that Marie Paul paid for her trip.

- On November 12, 2019, NSES paid $1,138.32 to a jewelry store, categorized as job materials. Ex. 131 at 294.

- On February 24, 2020, NSES paid $30,206.68 to the Cleveland Cavaliers. Ex. 114 at 228. Ms. Kish testified that the debtor had courtside Cleveland Cavaliers season tickets for two seasons, and that the debtor gave her four tickets to see two games.

- Ms. Kish testified that the debtor and Ms. Motil traveled frequently for personal, not business, reasons.

20

Even if some of these expenditures are valid business entertainment expenses, they still show the debtor's lavish lifestyle and help explain the deficiency of assets to meet the debtor's liabilities.

On other occasions, the business entities simply transferred funds directly to the debtor. For example, the debtor made numerous transfers from the NSES, NSEM, and ALV Twinsburg bank accounts to his personal checking account. The dates and amounts of these transfers make them unlikely to be wages of the debtor. Moreover, many of the transfers occur at times other than during normal payroll expenditures. Similarly, while Ms. Motil testified that the debtor's entities sometimes paid the mortgage on the Motil residence because the debtor was contemplating using the residence as an investment property, the different dates and amounts of these transfers mean this explanation could only apply to some of the following transfers.

- On December 23, 2019, the debtor transferred $600 from the NSES bank account to his personal checking account. Exs. 114 at 190, 123 at 120. The debtor and Ms. Motil received regular paychecks on December 13 and 31, 2019. Ex. 123 at 114, 120.

- On December 26, 2019, the debtor transferred $1,000 from the NSES bank account to his personal checking account. Exs. 114 at 190, 123 at 120. The debtor and Ms. Motil received regular paychecks on December 13 and 31, 2019. Ex. 123 at 114, 120.

- On January 8, 2020, the debtor transferred $10,500 from the NSES bank account to his personal checking account. Exs. 114 at 206, 123

21

at 120. The debtor and Ms. Motil received regular paychecks on December 31, 2019, and January 15, 2020. Ex. 123 at 120.

- On March 9, 2020, the debtor transferred $1,200 from the NSES bank account to his personal checking account. Exs. 114 at 245, 123 at 140. The debtor and Ms. Motil received regular paychecks on February 28, 2020, and March 13, 2020. Ex. 123 at 140.

- On March 25, 2020, the debtor transferred $500 from the NSES bank account to his personal checking account. Exs. 114 at 125, 123 at 148. The debtor and Ms. Motil received regular paychecks on March 13, 2020, and March 31, 2020. Ex. 123 at 140, 148.

- On May 4, 2020, the debtor transferred $1,602.62 from the NSEM bank account to his personal checking account. Exs. 116 at 124, 123 at 154. The debtor and Ms. Motil received regular paychecks on April 30, 2020, and May 15, 2020. Ex. 123 at 154.

- On July 8, 2020, the debtor transferred $1602.62 from the NSEM bank account to his personal checking account. Exs. 116 at 163, 123 at 173. The debtor and Ms. Motil received regular paychecks on June 30, 2020, and July 15, 2020. Ex. 123 at 173.

- On July 27, 2020, the debtor transferred $2,400 from the NSEM bank account to his personal checking account. Exs. 116 at 164, 123 at 182. The debtor and Ms. Motil received regular paychecks on July 15 and 31, 2020. Ex. 123 at 173, 182.

In addition to paying for the debtor's lifestyle, funds from new investors were also quickly used to repay earlier investors and fund other projects of the debtor's. For example, on January 8, 2020, Mr. Peter Linsky wired $60,000 to the NSES bank account in connection with an investment in one of the debtor's properties. Exs. 32 at 1; 114 at 201. The balance in the NSES checking account

22

the previous day had been -$2,080.06. Ex. 114 at 209. On the same day that

Mr. Linsky wired his funds to NSES, NSES wired $10,500 into the debtor's

personal checking account. Exs. 114 at 206; 123 at 120. Still on the same day,

NSES sent $12,557.51 to Alex Low, as a mortgage payment on the Dumetz

property in Los Angeles. Ex. 114 at 206. The debtor also made payments to the

Department of Education and Navient for student loans. Ex. 114 at 206–07. The

debtor also made interest payments to individual investors and On Deck Capital,

totaling $30,195.39. Exs. 114 at 206–07; 126 at 3.

Similarly, on January 30, 2020, Ms. Lori Rehn wired $150,000 into NSES's

checking account in connection with her investment in three of the debtor's

properties. Exs. 28, 29, 31, 114 at 202. That same day, NSES wired $50,500 to

Lerner Sampson Rothfuss. Ex. 114 at 208. NSES also wired Alex Low

$21,172.79 the next day. Ex. 114 at 208. Investors received $32,395 in interest

payments on January 31, 2020, and NSES also made Bluevine Capital interest

payments on January 30–31, 2020. Exs. 114 at 208, 126 at 3. The account balance

on January 29, the day before the transfer, was $2,891.51. Ex. 114 at 209. These

two examples illustrate a larger trend of the debtor using funds from new investors

to repay earlier investors, as well as supporting the debtor's other projects and

funding his lifestyle. Ex. 126.

23

One of those other projects was an online retail arbitrage business, operated by an entity called NSEC Amz, L.L.C. (NSEC Amz). North Shore Ecom incorporated NSEC Amz in July 2019 as an Ohio L.L.C. Ex. 138. The online business operated for about a year, from 2019 to early 2020. The business enlisted three or four virtual assistants outside the United States to find and list profitable items on Amazon. The debtor testified that when the business failed to realize the expected profit of 10 to 15 percent and to grow at the expected rate, the debtor decided not to pursue the project any further. Ms. Lowman testified the ledgers showed that the debtor identified startup costs of $73,760 for the Amazon store, corresponding to $91,000 in revenue, but that these numbers were not reliable. *See* Ex. 103 at 18 (identifying startup costs for the Amazon store). The income for the Amazon store was not reported on the NSES tax return, Ms. Lowman testified. Ms. Lowman also testified that payments to credit cards by the debtor's entities were ten times the revenue received for the Amazon store.

On October 15, 2019, NSES transferred $36,530 to NSEC Amz, which allowed it to make a payment of $36,529.81 on an American Express Card. Exs. 114 at 142; 118 at 5. On May 1, 2020, NSES transferred $42,500 to NSEC Amz, which NSEC Amz used to make a payment of $42,471.45 on an American Express card, which was returned for insufficient funds. Exs. 114 at 282; 118 at

24

19.  No record was introduced at trial to explain what charges were incurred on the American Express card.  And the debtor did not list a membership/ownership interest in NSEC Amz on his original or amended schedules.  Exs. 86 at 12–13; 95 at 5–6.

One further venture concerned marketing a cannabis-related patent the debtor owned.  Sometime in 2019, the debtor paid a business consultant $25,000 to help him market this patent without success.  Ex. 94 at 40–41.

NSES and NSEM also regularly provided loans to ALV Twinsburg when ALV Twinsburg was unable to meet expenses.  The following are representative examples.

- On January 30, 2019, $21,500 was transferred from NSES's checking account to ALV Twinsburg's checking account.  The previous day, ALV Twinsburg's checking account balance was $1,178.71.  On January 30, ALV Twinsburg paid $3,137.77 in wages, $787.52 in payroll taxes, and $185.21 in payroll fees.  On January 31, ALV Twinsburg made a $15,000 rent payment and a payment on the debtor's purchase agreement for the gym.  Exs. 114 at 6; 119 at 2–4.

- On March 8, 2019, $20,000 was transferred from NSEM's checking account to ALV Twinsburg's checking account.  The previous day, ALV Twinsburg's checking account balance was $1,764.82.  On March 8, ALV Twinsburg made a $15,000 rent payment and paid $3,761 for payroll, $997.50 for payroll tax, and $117.25 in fees.  Exs. 116 at 11; 119 at 52–54.

- On March 29, 2019, $16,500 was transferred from NSEM's checking account to ALV Twinsburg's checking account.  The previous day, ALV Twinsburg's checking account balance was -$366.49.  On

25

March 29, ALV Twinsburg paid $4,638.64 for payroll and $1,255.89 for payroll tax.  Exs. 116 at 11; 119 at 52–54.

Comparable transactions were made between NSEM or NSES and ALV Twinsburg on April 30, May 15, June 12, August 14, September 10, October 9, and November 14, 2019, as well as January 14 and 30, 2020.  Exs. 116 at 17; 119 at 78–80 (April 30); Exs. 114 at 67; 119 at 95–98 (May 15); Exs. 114 at 82; 119 at 120–22 (June 12); Exs. 116 at 50; 119 at 160–63 (August 14); Exs. 114 at 128; 119 at 175–78 (September 10); Exs. 114 at 143; 119 at 206–09 (October 9); Exs. 114 at 169; 119 at 232–35 (November 14); Exs. 114 at 207–08; 119 at 268–71 (January 14 and 30, 2020).

In sum, the debtor's finances exhibit a pattern of NSES and NSEM using investor funds to fund the debtor's lifestyle, repay earlier investors, and support the debtor's other business ventures.

*Fall of 2019 to July 2020*

In the fall of 2019, the debtor began to contemplate the purchase of a portfolio of properties from Watermark Partners, L.L.C., and related entities.  The debtor solicited advice about financing the purchase from mentors in the Arete Syndicate, a business networking group that the debtor paid $65,000 to join.  Exs. 114 at 98; 115; 126 at 1.

26

On September 20, 2019, Ms. Kish began managing full time the

ALV Twinsburg gym owned by the debtor.  Ex. P at 32.  While Ms. Kish testified

that she did not notarize any mortgages when she managed the gym, the debtor

testified that Ms. Kish continued her practice of notarizing unsigned mortgages and

sending them electronically to the debtor during this period.  In any event, the

debtor does not dispute that he continued to use an electronic template including

Ms. Kish's notary seal and signature after she no longer worked for him.  This left

creditors with the impression that their mortgages had been properly notarized.

The debtor testified that he wished he had spoken with Ms. Kish about continuing

to use her notary seal after her departure, but that he did not do so.  The Court does

not find credible the debtor's testimony that he truly believed there was nothing

wrong in his using an electronic copy of Ms. Kish's notary seal and signature to

notarize his signature on mortgages even after Ms. Kish was no longer employed

with any of the debtor's entities.  This is especially so given the language in the

acknowledgment clause of the mortgages that the debtor was signing:

> On this ____ date of _____, ____ personally appeared
> before me,
>
> _____,
>
> known to me or provided sufficient identification, to be the
> person(s) whose name(s) are subscribed to the within

27

instrument and acknowledged that they executed the same for the purposes therein contained.

(signature of Kristen Kish)          (seal)

Notary public

*See, e.g.*, Ex. 9 at 4.

On October 14, 2019, NSEM entered into a Purchase and Sale Agreement to purchase a portfolio of over 1700 units in Toledo and Akron from Watermark Partners, L.L.C., and related entities (Watermark), for $55,072,000. Compl. at 8–13, 35, 128, *North Shore Equity Mgmt., L.L.C. v. Watermark Partners, L.L.C.*, No. CV-2020-01-0235 (Summit Cnty. Ct. Com. Pl. Jan. 21, 2020). The agreement called for an initial deposit of $100,000, which NSES transferred on October 18, 2019. *Id.* at 14; Ex. 114 at 142. The agreement included an inspection period, which NSEM could extend until December 28, 2019, by providing notice and making a $250,000 Extension Deposit with American Title Company. Compl. at 14. On November 26, 2019, NSEM notified Watermark it intended to extend the inspection period and NSES made a deposit of $250,000 on December 9, 2019. *Id.* at 17; Ex. 114 at 189. During the extended inspection period, the debtor testified that a team of certified construction inspectors evaluated the units for occupancy and condition. The debtor's due diligence led him to propose a further reduction in the tentative purchase price, but the two sides were unable to reach a consensus as

28

to a final purchase price. The debtor delivered a Notice of Termination to Watermark on December 28, 2019, but Watermark instructed American Title not to return NSEM's deposit. Compl. at 18, 139.

From November 2019 until May 2020, the debtor and his family lived at 27066 Lake Road in Bay Village, Ohio (the Lake Road property). Exs. 129 at 1; 130 at 1. The debtor testified he intended either to live in the property if the Watermark deal closed, resell it for more than the asking price of $500,000, or renovate the property and increase his profits. Although the owner of the Lake Road property was willing to rent the property, she balked at selling it, at least at a price the debtor was hoping to pay. The inability to buy the Lake Road property coupled with the less than desirable conditions in the property caused the debtor and Ms. Motil to move out in May 2020. Between November 20, 2019, and May 4, 2020, NSES paid the owner of the Lake Road property $107,922.13 in rent. Ex. 129 at 1.

On January 21, 2020, NSEM filed suit against Watermark Partners, L.L.C., and related entities, alleging breach of contract and other causes of action. Compl. at 8–29, *North Shore Equity Mgmt., L.L.C. v. Watermark Partners, L.L.C.*, No. CV-2020-01-0235 (Summit Cnty. Ct. Com. Pl. Jan. 21, 2020). With the complaint, NSEM's attorneys attached an unredacted copy of the Purchase and

Sale Agreement. *Id.* at 32–128. The debtor testified that his attorney inadvertently revealed the tentative purchase price for the portfolio by attaching an unredacted copy of the Purchase and Sale Agreement. As a result of this purported breach of contract, the debtor ended up agreeing to forfeit all but about $160,000 of his original $350,000 deposit.

Ms. Kish resigned from working for the debtor's entities on February 4, 2020. Ex. 46 at 4. From February 10, 2020, until May 10, 2021, the debtor used an electronic version of Ms. Kish's signature and seal to notarize his own signature on mortgages. *See* Exs. 9–27.

On May 18, 2020, during the height of the pandemic, ALV Cleveland, L.L.C., an entity controlled by the debtor, purchased Titans Gym in downtown Cleveland from TTV's First, L.L.C., for a down payment of $50,000 and a purchase price of $350,000, payable in two cognovit notes. Ex. 122 at 55, 62. The debtor personally guaranteed ALV Cleveland's obligations under the notes and assumed TTV First's lease with 668 Atrium, L.L.C., on the same date. Ex. 122 at 44, 77–79.

To keep his business operations afloat, the debtor paid relatively high rates of interest over the short term, typically 12 percent. The debtor explained that paying high interest over a period of a few months while renovating a house would

30

constitute an acceptable cost.  The debtor also testified he expected to earn about 19 percent in return on his properties.  The debtor even agreed to pay one private lender interest of 3.33 percent per month.  Ex. N at 9–10.  From July 2019 to September 2020, burdened by these high-interest, short-term loans, the debtor contemplated refinancing his whole investment portfolio.  Ex. L.  However, the debtor decided that refinancing his entire portfolio, either piecemeal or as a whole, was not feasible because of the high appraisal and origination costs of such lending.  Instead, the debtor began seeking to sell his real estate portfolio and focus on the gyms.  Unfortunately, the debtor could not find ready buyers for his properties, and could not get Sharestates to respond concerning the liens it held on the Rocky River Drive apartments and Mansfield properties.  As a result, the debtor pulled all his properties off the market, except for the West 50th Street property, which was accidentally left on the market.

*August 2020 to June 2021: Investor Dissatisfaction and Legal Action*

On August 5, 2020, the debtor sent an email to investors explaining that August 2020 payments had not been made because the bank account had been suspended due to suspected fraud, and a new bank account could not send out particular electronic transactions for three weeks.  Ex. 57 at 27.  On August 11, 2020, the debtor offered investors seller-financed rentals, apparently to raise funds.

31

Ex. 57 at 29–33. From June 15, 2020, to October 9, 2021, Mr. Senseny tried to contact the debtor about missing payments on interest and principal and obtaining original copies of his mortgages to record. Ex. 75 at 1–20. Dr. Lynch testified that a check he received from the debtor, dated October 1, 2020, was returned for insufficient funds. *See* Ex. 60 at 1. Problems with the debtor's payments continued. On November 9, 2020, Dr. Lynch informed the debtor to direct further information to Dr. Lynch's counsel. Ex. 57 at 37–41. On December 12, 2020, Dr. Lynch filed a *lis pendens* on the West 4th Street property in Mansfield, Ohio, and on December 16, 2020, he filed a *lis pendens* on the West 50th Street property in Cleveland. Exs. 55 at 11–13; 56 at 11–13.

The debtor's cash flow crunch did not abate in 2021. On February 7, 2021, Lt. Col. Chase texted the debtor from Afghanistan that he had been waiting for payment for four months with no response from the debtor. Ex. 53 at 1. Beginning in February 2021, because of the missed payments, numerous investors filed suit against the debtor. *See* Ex. 97 at 5–7. Similarly, on March 3, 2021, Mr. Niec began texting the debtor, asking about his missing March deposit. Ex. 73 at 1. Later, on July 15, 2021, Lt. Col. Chase also texted the debtor: "Hundreds of stories in the private groups are getting wild about getting kicked out of investor groups, fraud, and forgery." Ex. 53 at 1. Lt. Col. Chase testified that during the

32

summer of 2021, there were rumors online surrounding possible problems with the notarization of the mortgages.

The debtor sent a mass email to his investors on March 22, 2021. Ex. K at 1. In the email, the debtor described his plans to sell off most his real estate properties and to use the equity to pay off investors and maintain cash flow. The debtor described the email as "not us pushing a panic button." Ex. K at 1.

On April 8, 2021, the debtor sold the West 50th Street property for approximately $32,000. Ex. 67 at 1. The debtor testified that he thought the property had been pulled off the market but decided to go ahead with the sale when notified it was ready to close. The debtor also testified he was unsure whether he was aware of Dr. Lynch's suit against the West 50th Street property because he was working long hours at the gym. Closing proceeds of $24,145.17 were deposited in the NSEM checking account on April 8, 2021. Ex. 116 at 294. On the same day, the debtor transferred $17,000 from the NSEM checking account to the ALV Twinsburg checking account, enabling the Twinsburg gym to meet payroll of $15,752.94. Exs. 116 at 296, 119 at 484, 488. The ALV Twinsburg checking account had had a negative balance of $899.73 the previous day. Ex. 119 at 490. The debtor testified that he did not reimburse the many mortgage holders on the property because he could not make good on all the investors' claims and

33

did not want to pay some investors but not others. The debtor did not notify any of the investors of the sale.

On May 20, 2021, the debtor sent out an additional email to investors, notifying them that low rent collections prevented him from making interest payments, and informing the investors that the debtor was seeking either to recoup lost rent, sell off properties, or restructure the debt. Ex. 54 at 8. In response, Lt. Col. Chase wrote:

> Because you have borrowed against the same properties
> multiples [sic] times without recording the mortgages with the
> county, how do you intend to pay the multiple lenders who
> have all been told they are in the first position on the same
> property? Even if you sell the properties, how do you intend
> to pay everyone back when you have borrowed so much more
> than the properties are worth?

Ex. 54 at 8.

The cash flow crisis resulted in legal action against the gyms, the real estate entities, and the debtor personally. On June 11, 2021, 668 Atrium, L.L.C. and TTV's First, L.L.C., filed an action against ALV Cleveland and the debtor for forcible entry and detainer and breach of contract. Ex. 122. Five days later, Bluestone Commercials, L.L.C., filed a forcible entry and detainer action against ALV Twinsburg and the debtor. Ex. 121. The state also filed numerous tax actions against ALV Cleveland and ALV Twinsburg. The real estate actions

34

against the debtor resulted in creditors unearthing the improperly notarized mortgages, which in turn led to criminal charges against the debtor.

*July 2021 to February 2022: Criminal Charges, Receivership, and the Transfer of the F-150*

On July 1, 2021, Mr. Michael Rodriguez emailed Ms. Kish seeking the original mortgage that she had apparently notarized on May 10, 2021. Ex. 46 at 4. However, Ms. Kish informed Mr. Rodriguez that she had not notarized the mortgage, that the notarization postdated her employment, and that she had had no contact with the debtor since her resignation. Ex. 46 at 4. Also on July 1, Ms. Kish reported the apparent fraud to the Ohio Notary Commission. Ex. 45 at 1. The next day, Ms. Kish reported the alleged fraud to the North Olmsted police along with three more mortgages given to Dr. Lynch, Ms. Danielle Hansen, and Mr. Brian Bonetta, that she had not notarized but that appeared to use her signature and seal. Ex. 46 at 4.

Zachary Burkons, of Rent Due, L.L.C., was appointed receiver of ALV Twinsburg on July 21, 2021, and receiver of ALV Cleveland on August 4, 2021. Order Appointing a Receiver, *TTV's Second, L.L.C., v. ALV Twinsburg, L.L.C.*, No. JL-2021-2033 (Summit Cnty. Ct. Com. Pl. July 21, 2021); Order Granting Motion for Appointment of a Receiver, *668 Atrium, L.L.C. v. ALV*

35

*Cleveland, L.L.C.*, No. CV-21-948656 (Cuyahoga Cnty. Ct. Com. Pl. Aug. 4, 2021).

On August 10, 2021, the debtor turned himself in and was released without paying bond. Ex. 46 at 7. On October 18, 2021, the debtor was charged with tampering with records, forgery, and identity fraud. *Ohio v. Motil*, No. CR-21-663384-A (Cuyahoga Cnty. Ct. Com. Pl. Aug. 10, 2021). He was arraigned on November 4, 2021, and posted bond of $2,500. *Id.*

The debtor and Ms. Motil testified that these criminal charges made them anxious that Ms. Motil have a reliable vehicle to get to work and take care of the children. Although Ms. Motil had previously put a down payment on a new Jeep, supply shortages meant Ms. Motil had no clear idea when she would receive her new Jeep. Ms. Motil testified that she wanted to purchase the Jeep because "we realized that the cars were in the businesses' name and may be taken away." On November 5, 2021, the debtor's father, Mr. Michael Motil, transferred $50,000 into the joint checking account of the debtor and Ms. Motil at the debtor's request. Ex. 123 at 284. There is nothing in the record to suggest that any of the funds the debtor's father transferred into the joint checking account were intended solely for the benefit of the debtor's spouse. Nor did the debtor's father place any other restrictions on how the funds were to be used.

36

The debtor testified that he did not give his father a promissory note for the funds and that his father viewed the funds as a gift, but the debtor viewed them as a loan. Using these funds, the debtor wired $10,000 to his attorney on November 5 and made a $7,797.01 payment on his credit card on November 9. Ex. 123 at 285.

On November 29, 2021, the debtor wrote a check from the joint checking account for $18,654.20 to 440 Auto Sales to buy a used F-150. Ex. 90 at 1. The debtor and Ms. Motil both testified that they had gone to the dealership that day intending to buy a vehicle for Ms. Motil and inquired if Ms. Motil needed to be present for the vehicle to be titled in Ms. Motil's name. The debtor testified that his major concern was that his "family wouldn't be taken care of" if he were to go to prison as the result of the improper notarization charges. After Ms. Motil left to take their children to piano lessons, the dealership advised the debtor that it could not title the vehicle in Ms. Motil's name, presumably, without her having to return to the dealership. As a result, on December 13, 2021, 440 Auto Sales transferred title in the F-150 to the debtor with the debtor signing a power of attorney to put the title in his name. Ex. 89 at 2–3. On December 30, 2021, the debtor transferred title of the F-150 to Ms. Motil. Ex. 92 at 2–3. The transfer is described in two ways. First, the transfer is described in the blank on the title as being in exchange for $1.00. Ex. 92 at 2. Second, this amount is placed in parentheses, with the word

37

"Gift" written underneath it. Ex. 92 at 2. The debtor testified that a title agent at the Ohio Bureau of Motor Vehicles wrote the word "Gift" on the title. In any event, there was no evidence to suggest that Ms. Motil gave the debtor $1 or any other consideration in exchange for the debtor transferring title to the truck in her name only. The debtor and Ms. Motil each testified that both of them drive the Jeep and the F-150, and the debtor conceded he was not sure whether he was insolvent at the time of the transfer.

Meanwhile, investor lawsuits continued. In an email sent to investors on November 1, 2021, the debtor acknowledged that "a few creditors" had filed legal claims against him and that the debtor was seeking to place all of his real estate holdings into receivership. Ex. 54 at 14. On November 15, 2021, and at the debtor's request, NS Equity, L.L.C. (NS Equity) and NSES filed a motion to appoint exSELLit, L.L.C., as receiver of the real properties held by the debtor's entities and to use KIKO Company as an auctioneer and real estate advisor. Ex. D. The entities filed an amended motion for a receiver on January 13, 2022. Ex. E. Judge Fuerst denied the amended motion on February 2, 2022. Ex. G. On February 9, 2022, Judge Sutula appointed Zachary B. Burkons, of Rent Due, L.L.C., as receiver of the real estate held by the debtor's entities. Ex. H.

38

The order appointing a receiver was appealed on February 25, 2022. Ex. I. The debtor testified that this appeal motivated him to consider filing for bankruptcy. The debtor spent over $168,000 in legal fees related to his real estate properties, including his bid to have a receiver appointed. Ex. F. at 1.

During the parties' battle over the receivership, on January 27, 2022, NSEM wired a $20,000 retainer to Coffey Law, presumably in contemplation of the debtor's impending bankruptcy. Ex. 116 at 345. Thus, less than a month elapsed between the debtor's transfer of the F-150 to Ms. Motil on December 30, 2021, and NSEM's wire transfer on January 27, 2022.

*March to December 2022: The Debtor's Original and Amended Filings*

On March 7, 2022, the debtor filed for Chapter 7 bankruptcy and disclosed seventeen L.L.Cs. in which he had a 100 percent interest, and three in which he held a 50 percent interest (Dremcubed, L.L.C., AXC Cleveland, L.L.C., and AXC Twinsburg, L.L.C.). Ex. 86 at 12–13. The debtor also disclosed that he had guaranteed the debts of many of his L.L.C.s. Ex. 86 at 21–46. On March 21, 2022, the debtor filed his Schedules I and J, as well as his Statement of Financial Affairs (SOFA). Exs. 87, 88.

39

Criminal charges against the debtor were dropped without prejudice on April 25, 2022. Journal Entry, *Ohio v. Motil*, No. CR-21-663384-A (Cuyahoga Cnty. Ct. Com. Pl. Apr. 25, 2022).

After obtaining two extensions, the U.S. Trustee filed a complaint objecting to the debtor's discharge on September 30, 2022. Adv. Proc. No. 22-1084, Docket No. 1. On December 16, 2022, the debtor filed an amended Schedule A/B, which disclosed two entities the debtor claimed were accidentally omitted from his original filing: Dope Ideas, L.L.C., and North Shore Ecom, L.L.C. Ex. 95 at 1. The debtor also filed an amended SOFA. Ex. 97.

In his amended schedules, the debtor listed nineteen L.L.C.s in which he had a 100 percent membership/ownership interest and three in which he had a 50 percent interest. Ex. 95 at 5–6. The debtor did not disclose an interest in BUYCLE114 in the amended schedules. Ex. 95 at 5–6. The U.S. Trustee alleged this failure to disclose BUYCLE114 in the debtor's amended schedules constituted a knowing or false oath, or alternatively demonstrated a reckless disregard for the truth. Am. Compl. 6, 35–36. In response, the debtor admitted that he had a 100 percent membership interest in BUYCLE114 and failed to disclose it on his amended Schedule A/B but asserted the omission was unintentional. Resp. to Am. Compl. (Answer & Affirm. Defenses) 3. At trial, the U.S. Trustee offered no

40

evidence or motive for the debtor to have intentionally failed to disclose this particular entity in the debtor's schedules. Rather, all evidence and inferences point to this omission as being inadvertent. The real property held by this entity, a single-family home located at 12409 Brookfield Avenue, in Cleveland (the Brookfield Avenue property), valued at $34,400, has at all times since February 9, 2022, been in the possession of the receiver, who presumably is collecting any rents for the benefit of the debtor's creditors. *See* Ex. H at 16 (including the Brookfield Avenue property in the receivership order) and Ex. 128 at 3 (providing the appraised value of the Brookfield Avenue property).

On the debtor's SOFA and amended SOFA, the debtor denied giving a gift worth more than $600 to any person within the two years before bankruptcy. Exs. 88 at 6; 97 at 8. The debtor also denied making a sale or transfer outside of the normal course of business during the two years before filing for bankruptcy. Exs. 88 at 7; 97 at 9. The debtor made these statements under penalty of perjury on both filings. Exs. 88 at 10; 97 at 13. At his meeting of creditors, the debtor again did not mention transferring the F-150 as a sale, transfer, or gift.

> Q  Have you sold anything in the last four years worth more
> than $500?
> A  I'm sure I have.
> Q  Any personal items?  I don't mean out of one of your
> businesses.

41

A  There's nothing big that stands out to me, but, you know, selling an old bike on Facebook Marketplace or something like that, I mean --
Q  Over $500?
A  Not that I recall.  I mean, not anything that I remember somebody handing me a bunch of money for.
Q  Have you given anything away in the last four years worth more than $500?
A  Not that I can think of over $500.

Ex. 94 at 46–47.

On January 18, 2023, Ms. Lowman was assigned to the current proceeding in the U.S. Trustee's office.  During her examination of the relevant documents, Ms. Lowman discovered the check the debtor wrote for the F-150.  Ms. Lowman then requested a records check for the debtor from the Bureau of Motor Vehicles, through which Ms. Lowman discovered the relevant titles and records.  Thus, the U.S. Trustee's office discovered the transfer of the F-150; the debtor only disclosed it after the U.S. Trustee discovered it.

*Trial: Transfer of the F-150 and Dissipation of Assets*

At trial, the debtor testified that his family's residence had always been titled in Ms. Motil's name and that, around the time he and Ms. Motil bought the F-150, the debtor had voluntarily returned a vehicle titled in his name to the dealership because he was behind on the payments for the vehicle.  The debtor denied knowingly or recklessly failing to disclose the F-150, but instead testified that he

42

did not realize that the retitling of the truck was a transfer that must be disclosed. Instead, the transfer from the debtor to Ms. Motil simply put things how they should have been in the first place. The transfer simply slipped the debtor's mind, the debtor testified.

The debtor further testified that he had not guaranteed most of the real estate entities' liabilities, despite disclosing personal guarantees for these entities in his schedules. Ex. 86 at 21–46. After the close of testimony, the debtor amended his schedules to reflect that he had not personally guaranteed many of the debts of the entities he controlled, but these newly amended schedules were not admitted into evidence and played no part in the Court's decision. Case No. 22-10571, Docket No. 139, at 4–29.

Dissipation of assets consumed a large proportion of trial testimony. At trial, the U.S. Trustee provided evidence that affiliates of the debtor bought eighty-three properties between November 2, 2017, and September 13, 2019, for an aggregate price of $3,441,395. From October 20, 2017, until May 1, 2021, affiliates of the debtor borrowed $7,786,900 from creditors. Thus, the U.S. Trustee argues that the debtor has failed to account for $4,345,505 in assets.

At trial, the debtor attempted to explain the apparent loss of such assets. Ex. Q. First, the debtor drew attention to the difference in time periods from when

43

the properties were acquired (November 2, 2017, to September 13, 2019) and when funds were invested with the debtor (October 20, 2017, to May 1, 2021). The debtor then explained that $309,955 of the alleged discrepancy resulted from the U.S. Trustee's use of the loan amounts for the properties, not the purchase prices of property acquired. Further, the debtor subtracted $2,773,316.02 corresponding to the combined negative net income of NSES and NSEM from the debtor's profit and loss statements produced using the software QuickBooks (including a $2,998,623.13 net loss for NSES and a profit of $225,307.11 for NSEM). The debtor further subtracted $134,321.67 as part of the earnest money on the Dumetz Avenue property not included in the profit and loss statement. The debtor then deducted loans NSES made to the gyms of $401,305.05 and loans NSEM made to the gyms of $161,764, although the debtor produced no documentation for such loans. The net loss on the Watermark apartment complex deal, including both the deposits of $350,000 and the settlement, amounted to a net loss of $209,095.70. The debtor subtracted three assignment fees not reflected on profit and loss statements (NSEM Mansfield 1 and 2 at $147,500 each and the Rocky River Drive apartments at $68,750). The debtor also subtracted the cost of goods sold through his Amazon store of $73,760.60, since only the revenue was reflected on the profit

44

and loss statement. Altogether, these expenses more than accounted for the loss of assets identified by the U.S. Trustee, the debtor argued.

In response, Ms. Lowman testified at length that both the tax returns and the profit and loss statements for the debtor's entities were unreliable due to the inadequacy of the records and the debtor's accounting inexperience. For example, Ms. Lowman drew attention to the unexplained difference in net income as reported on the U.S. Return of Partnership Income for the debtor's entities prepared by the debtor and on the Profit and Loss statements for the same entities (P&L). These results can be summarized as follows (rounded to the nearest dollar).

|  | NSES Tax Return | NSES P&L | NSEM Tax Return | NSEM P&L | ALV Twinsburg Tax Return | ALV Twinsburg P&L |
|---|---|---|---|---|---|---|
| 2020 | -$1,131,814 | -$989,899 | -$4,895 | -$3,095 | -$181,575 | -$111,837 |
| 2021 | -$336,974 | -$324,520 | -$50,178 | -$25,646 | -$18,169 | -$35,292 |

In addition to this brief example, Ms. Lowman spent a significant portion of her trial testimony highlighting the unsatisfactory nature of the debtor's financial records in other respects. For example, the debtor provided ledgers and profit and loss statements produced by QuickBooks, which Ms. Lowman testified did not include explanatory information such as payees and do not accurately reflect real business transactions. The financial records also demonstrate the debtor's

45

accounting inexperience, Ms. Lowman testified.  For example, the debtor sometimes treated earnest money as security deposits and treated lender reserves as assets when they should have been treated as either a liability or a depreciating asset.  The debtor also failed to correlate the payments to credit cards with expenses incurred in his business.

Evidence produced at trial includes the general ledgers for NSES, NSEM, and ALV Twinsburg produced on QuickBooks, as well as bank records for NSES, records for two NSEM bank accounts, bank records for ALV Twinsburg and ALV Cleveland, the debtor's personal banking statements, and credit card statements for the Chase United Miles Plus card in the name of NSES.  The debtor did not provide statements for American Express and Cabela's credit cards held by the debtor's entities.  The ledgers and bank accounts do not explain or account for the transfers between the entities the debtor owned; they merely list the amounts of the transactions, Ms. Lowman testified.

## CONCLUSIONS OF LAW

The U.S. Trustee, as the party seeking to deny the debtor's discharge, must prove each element of an action under § 727 by a preponderance of the evidence. *See* Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000).  An action to deny the

46

debtor a discharge is to be construed "liberally in favor of the debtor" and strictly against the party seeking denial of discharge. *Vara v. McDonald (In re McDonald)*, 29 F.4th 817, 822 (6th Cir. 2022) (citing *Keeney*, 227 F.3d at 683).

The U.S. Trustee's amended complaint contains six different claims for relief.

In Amended Count 1(A), the U.S. Trustee alleges that the debtor intended to hinder, delay, or defraud creditors under § 727(a)(2)(A) by concealing or converting the proceeds of the sale of the West 50th Street property from creditors he had promised first mortgages on the property.

In Amended Count 1(B), the U.S. Trustee alleges that the debtor intended to hinder, delay, or defraud creditors under § 727(a)(2)(A) by the prepetition transfer of the F-150 to the debtor's wife.

In Amended Count 2, the U.S. Trustee alleges that the debtor intentionally falsified or mutilated the alleged mortgages under § 727(a)(3) through the use of a forged or false digital notary document.

In Amended Count 3(A), the U.S Trustee alleges that the debtor knowingly or recklessly made false oaths under § 727(a)(4)(A) by failing to disclose his ownership of his entity BUYCLE114.

47

In Amended Count 3(B), the U.S. Trustee alleges that the debtor knowingly or recklessly made false oaths under § 727(a)(4)(A) pertaining to the prepetition transfer of the F-150 to the debtor's wife.

In Amended Court 4, the U.S. Trustee alleges that the debtor failed to satisfactorily explain the loss or diminution of the debtor's assets to meet liabilities under § 727(a)(5).

The Court will address each of these six claims for relief.

### Amended Count 1(A)— Prepetition Transfer of the West 50th Street Property

Section 727(a)(2)(A) requires the Court to grant the debtor a discharge unless—

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing the petition[.]

This section comprises two elements: "1) a disposition of property, such as concealment, and 2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.' " *Keeney*, 227 F.3d at

48

683 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)).

If a transfer of property forms the basis of a claim under § 727(a)(2)(A), the transfer must have occurred in the year before the debtor filed for bankruptcy. *McDermott v. Kerr (In re Kerr)*, Chap. 7 Case No. 15-30531, Adv. No. 15-3085, 2017 WL 3880875, at *9 (Bankr. N.D. Ohio Aug. 30, 2017). The Bankruptcy Code defines a transfer broadly, including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D). Circumstantial evidence can support an inference of the debtor's intent to hinder, delay or defraud a creditor. *See U.S. Trustee v. Varner (In re Varner)*, Chap. 7 Case No. 14-61103, Adv. No. 14-6021, 2015 WL 4039390, at *12–13 (Bankr. N.D. Ohio June 30, 2015) (listing factors relevant to determining intent).

In Amended Count 1(A) the U.S. Trustee argues that the debtor should be denied a discharge under § 727(a)(2)(A) based on two theories: (1) that the Court should treat the debtor and the debtor's entities, including NS Equity, the entity that owned the West 50th Street property, as "alter egos" so that the West 50th Street property and the proceeds from its sale constitute property of the debtor under § 727(a)(2)(A); and (2) that the debtor converted or embezzled the

49

proceeds of the sale of the West 50th Street property, thereby making the proceeds property of the debtor even absent an "alter ego" determination. For the reasons that follow, the Court holds that the U.S. Trustee has not proven his case under either theory.

### 1. "Alter Ego" and the Transfer of the West 50th Street Property

At trial, the U.S. Trustee argued that the Court should treat the debtor and the debtor's entities, including NS Equity, the entity that owned the West 50th Street property, as "alter egos" so that the West 50th Street property and the proceeds from its sale constitute property of the debtor under § 727(a)(2)(A). As outlined in this Court's earlier Memorandum of Opinion, courts disagree as to the applicability of this theory under § 727(a)(2)(A), and no binding precedent resolves the issue. Mem. Op. 12–16 (Docket No. 21). As already explained, the Sixth Circuit's holding in *Adams* provides no support for applying an "alter ego" theory under § 727(a)(2)(A). *See Barclays/ Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 394 n.2 (6th Cir. 1994); *cert. denied*, 513 U.S. 1111 (1995). In *Adams*, both the debtors and the company in question had filed for bankruptcy, and so the Sixth Circuit determined the assets of the company constituted the debtors' property by applying § 727(a)(7). *See id.*

50

The Court first notes that "veil piercing" and "alter ego" theories are well-recognized principles for making shareholders liable for the *debts* of a corporation when a corporation uses the limited liability that comes with its entity status to accomplish wrongful purposes. *See United States v. Bestfoods*, 524 U.S. 51, 62–64 (1998) (holding that a parent company may be derivatively liable for the environmental damage caused by a subsidiary only when the corporate veil may be pierced); *see also Church Joint Venture, L.P. v. Blasingame*, 947 F.3d 925, 935–36 (6th Cir. 2020) (Sutton, J., concurring) (observing that while "alter ego" and "veil piercing" are well recognized principles with respect to the law of corporations, these concepts should not be imported into the law of trusts); *In re Appalachian Fuels, L.L.C.*, 493 B.R. 1, 17–20 (B.A.P. 6th Cir. 2013) (examining *Bestfoods* and derivative liability in the context of administrative claims brought against related Chapter 11 debtors).

In this proceeding, however, the U.S. Trustee is not seeking to use "veil piercing" or "alter ego" theories to make the debtor liable for the debts of his separate entities. Rather, the U.S. Trustee seeks to have this Court disregard corporate separateness to make an asset of NS Equity into "property of the debtor" for purposes of denying the debtor a discharge under § 727(a)(2)(A). As explained below, the Court has serious concerns about the propriety and consequences of

51

extending these principles of "veil piercing" and "alter ego" to the determination of whether a debtor is entitled to a discharge under the Bankruptcy Code.

The U.S. Trustee seeks to have the Court treat the debtor and the debtor's entities, including NS Equity, the entity that owns the West 50th Street property, as "alter egos" under principles of Ohio law. What constitutes "alter ego" under Ohio law is a bit of an open question. Some courts refer to the alter ego doctrine as the first element of a three-part test for piercing the corporate veil in *Belvedere Condo. Unit Owners Ass'n v. R.E. Roark Cos.*, 617 N.E.2d 1075, 1086 (Ohio 1993) ("[C]ontrol over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own."). *See Goolsby v. Best in Neighborhood L.L.C.,* No. 3:19 CV 2664, 2022 WL 4551041, at *2 (N.D. Ohio Sept. 29, 2022); *accord Denny v. Breawick, L.L.C.*, 2019-Ohio-2066, 137 N.E.3d 578 (Ohio Ct. App. 2019), at ¶ 17. On the other hand, the Sixth Circuit has described "veil piercing" and "alter ego" as separate concepts.

> Veil piercing and alter ego concepts are separate and distinct. In general, as the Seventh Circuit has explained, "[e]fforts to pierce the corporate veil ask a court to hold *A* vicariously liable for *B* 's debt." *Bd. of Trustees, Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1038 (7th Cir.2000). By contrast, "a contention that *A* is *B* 's 'alter ego' asserts that *A* and *B* are *the same entity; liability* then is not vicarious but direct." *Id.* (citations omitted) (emphasis in original).

52

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005). *See also Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 196 n.18 (Bankr. S.D. Ohio 2022) (discussing the different views as to whether "alter ego" constitutes a "standalone claim" under Ohio law).

In any event, these principles are generally used for making a shareholder vicariously liable for the debts of a corporation ("veil piercing") or making the shareholder directly liable for the debts ("alter ego").

Were the Court to apply these state law principles to defining "property of the debtor" to a discharge determination under § 727(a)(2)(A) of the Bankruptcy Code, a debtor's discharge could depend on the vagaries of state law. The same debtor conduct that might lead to a denial of discharge in Ohio could result in the granting of a discharge in Michigan. This seems contrary to the Constitutional requirement of "uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art. I, § 8, cl. 4.

In addition, an "alter ego" determination would potentially disrupt the existing bankruptcy and state court receivership proceedings involving the debtor and the debtor's many separate entities. If the debtor and the debtor's entities are "alter egos," does that make all of the assets of these separate entities property of the bankruptcy estate under § 541? Does the bankruptcy trustee now displace the

53

state court receivers as trustee over all the separate entities and all the real

properties held by these entities?  Does the automatic stay now extend to all the

real property held by these separate entities under § 361?

These are not just academic questions.  As the Tenth Circuit B.A.P. noted in

applying just such a theory:

> "It is well established that property of the debtor in the possession, custody and control of its alter ego comprises property of the estate at the commencement of the case, and that bankruptcy courts have the power to disregard separate corporate entities so as to reach the assets of its non-debtor alter ego to satisfy debts of the debtor."

*In re Butler*, 359 B.R. 356 (B.A.P. 10th Cir. 2007) (unpublished table decision)

(quoting *Blomberg v. Riley (In re Riley)*, 351 B.R. 662, 671 (Bankr. E.D. Wis.

2006)).  *See also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015)

(addressing the question of whether Article III permits bankruptcy judges to

adjudicate *Stern* claims with the parties' knowing and voluntary consent).  In

*Wellness v. Sharif*, the purported *Stern* claim was a creditor's claim for a

declaratory judgment that a related trust was the debtor's "alter ego" and that its

assets should therefore be treated as part of the debtor's bankruptcy estate.  *Id.* at

672.  While *Butler* and *Wellness v. Sharif* demonstrate that alter ego principles may

have a place in determining property of a debtor's estate, the undersigned judge is

concerned that an "alter ego" determination in the context of a denial of discharge

claim could have unexpected consequences. Would the trustee in Motil's bankruptcy case now need to do nothing further to bring these properties into the debtor's bankruptcy estate? What about all the provisions in Chapter 5 of the Bankruptcy Code for avoidance actions and bringing property into a bankruptcy estate? Would they be unnecessary? If there is an "alter ego" determination, would creditors of the debtor and the different entities all have claims against a single entity as is the case under substantive consolidation? And would creditors and other parties in interest have an opportunity for notice and a hearing before these determinations are made? *See Huntington Nat'l Bank v. Richardson (In re Cyberco Holdings, Inc.)*, 734 F.3d 432, 438–40 (6th Cir. 2013) (discussing the concept of substantive consolidation and concluding that an order denying such a request is not a final appealable order); *Daniels*, 641 B.R. at 191–97 (denying Chapter 7 trustee's request to reach assets of related entities under substantive consolidation and "alter ego" theories); *see generally* R. Haines, *It's Time to Return to Our Roots: The Bankruptcy Common Law That Governs Insolvent Estates*, 95 Am. Bankr. L.J. 501 (2021) (highlighting the need for insolvency law to govern bankruptcy issues where third-party creditor rights must be considered). Just as Judge Sutton cautioned in his concurring opinion in *Blasingame* about extending principles of "veil piercing" and "alter ego" to the law of trusts, *see*

55

*Blasingame*, 947 F.3d at 935–36 (Sutton, J., concurring), here the undersigned

judge is concerned about the consequences of extending these principles to

insolvency law, particularly the issue of whether a debtor should be denied a

discharge under the Bankruptcy Code.

The U.S. Trustee's broad reading of property of the debtor in § 727(a)(2)(A)

is also problematic because it renders the provisions of § 727(a)(7) largely

redundant. If § 727(a)(2) were to encompass property deemed to be debtor's

property under an "alter ego" theory, there would be little use for paragraph (a)(7)

of § 727, which is expressly limited to acts that the debtor commits within one year

of the filing of a petition or during the bankruptcy case in connection with an

insider of the debtor. *Cf. RadLAX Gateway Hotel, L.L.C. v. Amalgamated Bank*,

566 U.S. 639 (2012). In *RadLAX*, the Supreme Court unanimously held that a

general clause in the Bankruptcy Code should not be read so broadly as to render a

specific clause superfluous. *Id.* at 645–47. "The general/specific canon explains

that the 'general language' of clause (iii), 'although broad enough to include it, will

not be held to apply to a matter specifically dealt with' in clause (ii)." *Id.* at 646

(quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)). If this

Court were to apply "alter ego" principles to a denial of discharge claim under

§ 727(a)(2)(A), it would appear to go against the limits that Congress set in the text

56

of § 727(a)(7) for conduct involving an insider, but only if the insider files for bankruptcy.

The application of "alter ego" principles to § 727(a)(2) is also problematic because under an "alter ego" determination, the debtor and all the debtor's entities would be treated as one in the same. *See Aguirre*, 410 F.3d at 302. Transfers between and among the debtor and the individual entities would largely be irrelevant. The debtor could legitimately argue that using proceeds from the West 50th Street property to make payroll for the gym was harmless, because this was all one big enterprise that he was trying to keep afloat.

The U.S. Trustee asserts that the debtor should not be able to escape from the consequences of his wrongdoing by creating separate legal entities and using those entities to deceive investors and discharge any personal liability. But under the Bankruptcy Code not every case of fraudulent prepetition conduct constitutes grounds for denial of discharge of *all* debts. *See, e.g.*, 11 U.S.C. § 727(a)(2)(A) (excluding improper transfers made more than one year before bankruptcy) and 11 U.S.C. § 727(a)(7) (extending the application of § 727(a)(2) through (a)(6) in connection with insiders, but only if the insider has its own bankruptcy case).

Rather, the Bankruptcy Code has detailed provisions for nondischargeability of specific debts for fraud or other reasons. *See, e.g.*, 11 U.S.C. § 523(a)(2). Even

57

if this debtor were to receive a Chapter 7 discharge, individual creditors would not lose their right to pursue nondischargeability determinations as to their particular claims. Similarly, the Bankruptcy Code excepts from discharge all debts for violation of federal or state securities laws. *See* 11 U.S.C. § 523(a)(19).

While the provisions of § 523 may not be as "mind-numbingly detailed" as the exemption provisions of § 522 at issue in *Law v. Siegel*, 571 U.S. 415, 424 (2014), courts should similarly be hesitant to alter the balance struck in the Bankruptcy Code as to what conduct merits denial of discharge of *all* debts under § 727 as opposed to particular debts under § 523.

Plus, victims of a debtor's prepetition fraud may actually be better off with a finding that only their claims against the debtor are deemed nondischargeable. Defrauded creditors may actually prefer not having to compete with the debtor's general creditors when engaging in future collection efforts against the debtor.

In any event, such equitable concerns are limited by the plain text of the Bankruptcy Code. *See, e.g.*, *Trivedi v. Levine (In re Levine)*, Chap. 7 Case No. 14 B 10740, Adv. No. 14 A 00461, 2014 WL 7187007, at *4 (Bankr. N.D. Ill. Dec. 16, 2014) (emphasizing that equitable remedies such as "alter ego" do not trump the text of the Code). *See also Sunbeam Prods., Inc. v. Chi. Am. Mfg., L.L.C.*, 686 F.3d 372, 375 (7th Cir. 2012) ("What the Bankruptcy Code provides, a

58

judge cannot override by declaring that enforcement would be 'inequitable.' ").
*Cf. RadLAX*, 566 U.S. at 649 ("The Bankruptcy Code standardizes an expansive
(and sometimes unruly) area of law, and it is our obligation to interpret the Code
clearly and predictably, using well established principles of statutory
construction.").

　　For all of these reasons, the undersigned judge believes the statute is best
read as requiring the property in question actually be "property of the debtor" at
the time of the improper transfer or concealment, as opposed to becoming property
of the debtor only through some later court determination.  *See SC Advisors 7,
L.L.C. v. Rudnick (In re Rudnick)*, Chap. 7 Case No. 20-40124, Adv.
No. 20-04013, 2021 WL 1347548, at *4 (Bankr. N.D. Fla. Mar. 3, 2021) ("Section
727(a)(2) does not apply to '*hypothetical* assets creditors later may bring into the
estate under fraudulent transfer or alter ego theories.' ") (emphasis in original)
(footnote omitted).  Therefore, the U.S. Trustee has failed to prove the first element
required by *Keeney*, a disposition of the debtor's property, under the "alter ego"
theory in Amended Count 1(A).  *See Keeney*, 227 F.3d at 683.

　　*2. Conversion and the Transfer of the West 50th Street Property*

　　The U.S. Trustee also argues that the Court should deny the debtor a
discharge under § 727(a)(2)(A) because the debtor's transfer of $17,000 from

59

NSEM to ALV Twinsburg constituted the debtor embezzling or converting NSEM's property and later transferring it to ALV Twinsburg. The U.S. Trustee argues again that *Adams* allows Courts to deny discharge to debtors who transfer corporate assets into an account and use those funds for their own benefit. *Adams*, 31 F.3d at 394 n.2.

As explained, *Adams* involved related entities that filed for bankruptcy, making § 727(a)(2) applicable to property of the related entity under § 727(a)(7). *See id.* Here, the debtor's L.L.C.s are not in bankruptcy. Again, the U.S. Trustee has not explained how the transfer of funds from NSEM to ALV Twinsburg ever became property of the debtor; the debtor merely transferred funds from one L.L.C. to another. Perhaps the U.S. Trustee's argument is analogous to the debtor writing a check for cash on the NSEM account and then depositing the cash in the ALV Twinsburg account. The U.S. Trustee would contend that the cash the debtor had withdrawn was at least temporarily property of the debtor until it was deposited into the ALV Twinsburg account.

The Court rejects this argument for several reasons. First, there is no evidence that the debtor ever converted the proceeds from the sale of the West 50th Street property to cash. More important, even if the debtor directed the transfer of proceeds from the account of one entity to the account of another entity,

60

absent some sort of "alter ego" theory that the Court has already rejected as inappropriate in the context of a denial of discharge claim, there is no indication that the debtor did so in his individual capacity as owner of the proceeds. Therefore, the U.S. Trustee has failed to prove that the transfer of $17,000 constituted "property of the debtor" for purposes of § 727(a)(2)(A) under a theory of conversion or embezzlement, and so has failed to prove *Keeney*'s first element. *See Keeney*, 227 F.3d at 683. Thus, the U.S. Trustee has not proven the debtor should be denied a discharge under § 727(a)(2)(A) with respect to the West 50th Street property in Amended Count 1(A).

*Amended Count 1(B) — Prepetition Transfer of the F-150*

Denial of discharge under § 727(a)(2)(A) requires (1) a disposition or transfer of the debtor's property; and (2) fraudulent intent. *See Keeney*, 227 F.3d at 683. Courts have identified badges of fraud that can help identify circumstantial evidence of the relevant intent, including the following.

> (1) a lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) the retention of possession for use and benefit; (4) the financial condition of the transferor before and after the transfer; (5) the cumulative effect of the transactions and course of conduct after the onset of financial difficulties or threat of suit; and (6) the general chronology and timing of events.

61

*Varner*, 2015 WL 4039390, at *13 (citing *C & H Elec. v. Newell (In re Newell)*, 321 B.R. 885, 889–90 (Bankr. N.D. Ohio 2005)).

Here, the element requiring disposition of property is satisfied because the debtor transferred the F-150, a vehicle titled in his name, to Ms. Motil. The transfer took place on December 30, 2021, well within a year of the date he filed for bankruptcy on March 7, 2022. Thus, the crucial issue in evaluating the transfer of the F-150 is intent.

The enumerated badges of fraud support a finding that the debtor had an intent to hinder, delay, or defraud creditors. (1) The title indicates that the transfer of the F-150 to Ms. Motil was either a gift or was undertaken in consideration for $1.00. Given that the debtor had just paid $18,654.20 for the vehicle, the transfer did not reflect the vehicle's true value. (2) The debtor transferred the F-150 to his spouse, a close family relationship. (3) The debtor continued to drive the vehicle as he had previously. (4) The transfer of the F-150 deprived the debtor's creditors of the potential for recouping the value of the vehicle from the debtor. The debtor was subject to numerous lawsuits alleging fraud, not to mention obligations the debtor had personally guaranteed, such as rent and debts on the gyms and debts to Sharestates. Thus, it is very likely that the debtor was insolvent or close to it at the time he transferred the F-150. The debtor himself testified he was not sure if he

62

was solvent when he transferred the vehicle. (5). The debtor returned a vehicle titled in his name that he was behind in payments on. Moreover, the debtor's wife testified that she and the debtor knew that vehicles may be taken away if they were titled in the name of his entities. Circumstances suggest the debtor was attempting to put assets beyond the reach of creditors.

(6) The transfer of the F-150 on December 30, 2021, occurred less than a month before NSEM wired Mr. Coffey his retainer on January 27, 2021, presumably in contemplation of the debtor filing for bankruptcy. Granted, the debtor testified that he did not have the required intent in transferring the F-150 because the debtor was not contemplating bankruptcy then and because he thought creditors would be fully paid off by the receiver selling his real estate. However, the Court does not find this testimony to be credible because of the proximity in time between the transfer of the F-150 and the transfer of funds to Mr. Coffey, among other reasons. Ms. Motil's testimony also suggests that the purchase and ownership of the Jeep (and by extension, the F-150) were at least in part motivated by the realization that vehicles owned by the debtor's entities or by the debtor himself might be lost to creditors. Given that the debtor was in the process of asking a state court to appoint a receiver over his entities' real properties, it is

63

reasonable to infer that the debtor was aware that creditors might in turn seek to have a receiver liquidate any of the debtor's personal assets of value.

In addition, the debtor's experience as a businessperson renders his testimony that he did not recall the transfer not credible. *See McDermott v. Koch (In re Koch)*, 564 B.R. 553, 567 (Bankr. E.D. Mich. 2017) (finding that a debtor did not accidentally fail to disclose transfers of a vehicle and personal watercraft sixteen days before filing for bankruptcy in part because the debtor was a "sophisticated businesswoman").

That the debtor did not disclose the transfer in his original or amended filings or at the meeting of creditors implies the debtor intended to conceal the transfer of the vehicle. " '[G]enerally, a debtor's amendment of . . . schedules and/or reporting of omissions or misstatements *prior to or at the meeting of creditors* evidences a lack of fraudulent intent.' " *Id.* at 568 (quoting *Buckeye Ret. Co., L.L.C. v. Heil (In re Heil)*, 289 B.R. 897, 908 (Bankr. E.D. Tenn. 2003)) (emphasis in original). Here, Ms. Lowman discovered the transfer; the debtor only disclosed it after the U.S. Trustee discovered it. For these reasons, the Court concludes the debtor had sufficient intent to hinder, delay, or defraud creditors by concealing the transfer to deny the debtor a discharge.

64

The debtor's arguments to the contrary are unavailing. That the vehicle would have been originally titled in Ms. Motil's name but for her having to leave the dealership does not overcome the presumption of the debtor's ownership on the vehicle title. Courts cannot recognize an ownership interest in a vehicle under Ohio law apart from an interest which arises from certificates of title, by admission or stipulation, or as evidenced by a valid security agreement. *See* O.R.C. § 4505.04(B); *see also Smith v. Prokos (In re Smith)*, Chap. 13 Case No. 16-60272, Adv. No. 16-6011, 2016 WL 3619799, at *3 (Bankr. N.D. Ohio June 28, 2016) (Kendig, J.) (explaining that, in addition to statutory exceptions, some courts recognize equitable interests in vehicles apart from certificates of title based upon express trusts). Here, there is no evidence of an express trust, and no other statutory exception applies.

The Court also rejects the debtor's argument based on the relatively small value of the F-150 in proportion to the total amount of creditors' claims filed. While the sale of the used vehicle may not be much in comparison with the roughly $10,000,000 in claims filed, there is no indication that the trustee would find this vehicle to be of inconsequential value and benefit to the estate. *Cf.* 11 U.S.C. § 554(a). The Court notes that the Chapter 7 trustee has already seen fit to sell a Rolex watch belonging to the debtor for $9,000, which is approximately

65

half the purchase price of the F-150.  Case No. 22-10571, Docket No. 119.

Moreover, the vehicle had significant value to the debtor and his family, especially

with the likely loss of vehicles owned or leased by the debtor's entities.

Rather, this case resembles the transfer of a personal watercraft and two

vehicles in *Koch*.  564 B.R. at 553.  Candis Koch transferred the watercraft and a

Jeep Grand Cherokee only sixteen days before filing for bankruptcy, as well as

another vehicle in the year before filing.  *Id.* at 559–60, 568.  The Court inferred

from the debtor's sophistication in business matters that her failure to disclose was

not inadvertent, and that her waiting ten months to amend her schedules to disclose

the transfers weighed against her credibility.  *Id.* at 567–68.  The debtor testified

that she bought the vehicles for her daughter, even though the debtor's name was

on the title, ostensibly for "insurance purposes."  *Id.* at 568 & n.37.  However, the

court concluded this was insufficient to overcome the presumption of ownership

from the certificate of title under Michigan law, and that there was no evidence of

an express trust.  *Id.* at 568.  That the debtor occasionally drove the vehicle herself

meant that the debtor did not purchase the vehicle solely for her daughter.  *Id.*  The

court concluded that the debtor's discharge should be denied in view of these

transfers.  *Id.* at 569.

Here, there is a similarly brief window between the transfer of the F-150 and the transfer of funds from NSEM to the debtor's bankruptcy attorney (less than a month, compared with sixteen days between the transfers and filing for bankruptcy in *Koch*). Unlike Candis Koch, the debtor in this case never disclosed the transfer. Both debtors are experienced businesspeople, and Ohio law, like Michigan's, does not permit courts to consider ownership interests in vehicles outside of certificates of title, with narrow exceptions.

Moreover, even if the F-150 had been titled directly in the name of the debtor's wife, there would still have been a transfer with the intent to hinder, delay, or defraud by taking money the debtor's father transferred into a joint account held by the debtor and his wife and converting it into a truck owned only by the debtor's wife, without any consideration, which the debtor still had the use and benefit of, all while the debtor was likely insolvent. Nor is there anything in the record to suggest that any of the funds the debtor's father transferred into the joint checking account were intended solely for the benefit of the debtor's spouse.

For these reasons, the Court concludes the debtor possessed the required intent to hinder or delay creditors under § 727(a)(2)(A) and that the U.S. Trustee has met all the elements for his claim in Amended Count 1(B).

67

*Amended Count 2— Falsification or Mutilation of Recorded Documents*

A court should deny the debtor a discharge under § 727(a)(3) if—

> the debtor has concealed, destroyed, mutilated, falsified, or
> failed to keep or preserve any recorded information, including
> books, documents, records, and papers, from which the
> debtor's financial condition or business transactions might be
> ascertained, unless such act or failure to act was justified
> under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).  The purpose of this statute is to provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable time past to present."  *See U.S. Trustee v. Zhang (In re Zhang)*, 463 B.R. 66, 91 (Bankr. S.D. Ohio 2012) (quoting *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 882 (B.A.P. 6th Cir. 1999) (additional quotation and quotation marks omitted).  *See also Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755, 761 (9th Cir. 2008) (quoting *Burchett v. Myers*, 202 F.2d 920, 926 (9th Cir. 1953)) ("The disclosure requirement removes the risk to creditors of 'the withholding or concealment of assets by the bankrupt under cover of a chaotic or incomplete set of books or records.' ").

As the Court explained in its earlier Memorandum of Opinion, § 727(a)(3) is ambiguous.  Mem. Op. 21–23 (Docket No. 21).  Courts disagree whether prepetition actions that mutilate or falsify the debtor's records can serve as the

68

basis for denial of discharge if the debtor's financial conditions and business transactions can be ascertained after the debtor files for bankruptcy. *Compare Phillips v. Bourget (In re Bourget)*, 176 B.R. 25, 27–29 (Bankr. C.D. Cal. 1994) (denying a discharge under § 727(a)(3) because the debtor falsified invoices before bankruptcy to receive payment more quickly, even though he did not receive more than the contractual amount) *with Randolph v. Fry (In re Fry)*, Chap. 7 Case No. 20-20641, Adv. No. 20-00098, 2022 Bankr. LEXIS 251, at *15–22 (Bankr. W.D. Tenn. Jan. 26, 2022) (holding that because the debtor's fraudulent actions did not prevent creditors from understanding the debtor's financial condition or business transactions, the court would not deny the debtor's discharge under § 727(a)(3)).

Courts are also split as to whether the falsification or failure to keep and preserve records must render it *impossible* to ascertain the debtor's financial condition or business transactions, or whether it is enough that the absent or falsified records *might* enable one to ascertain the debtor's financial condition or business transactions. All Courts of Appeals to have considered this issue have concluded that the falsification or absence of records must render the debtor's financial conditions or business transactions *impossible* to ascertain. *See Berger & Assocs. Att'ys, P.C. v. Kran (In re Kran)*, 760 F.3d 206, 210–11 (2d Cir. 2014);

69

*Meridian Bank v. Alten*, 958 F.2d 1226, 1232 (3d Cir. 1992); *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 354 (4th Cir. 2007); *The Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 697 (5th Cir. 2009); *Lee Supply Corp. v. Agnew (In re Agnew)*, 818 F.2d 1284, 1290 (7th Cir. 1987); *Snyder v. Dykes (In re Dykes)*, 954 F.3d 1157, 1162–63 (8th Cir. 2020); *Caneva*, 550 F.3d at 761; *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997).

Other courts follow a more lenient approach, reflective of the statutory language that the debtor's financial condition or business transactions "might be ascertained." *See, e.g.*, *U.S. Trustee v. Kandel (In re Kandel)*, Chap. 7 Case No. 11-62597, Adv. No. 12-6003, 2015 WL 1207014, at *6 (Bankr. N.D. Ohio Mar. 13, 2015). Under this standard, the plaintiff must: (1) show the nature of the debtor's business or financial condition and the types of business transactions likely to be at issue; (2) identify the information concealed, destroyed, falsified, or not kept by the debtor; and (3) demonstrate how the absent or falsified information "might" enable the Court to understand the debtor's financial condition or business transactions "under the circumstances of the case." *Strzesynski v. Devaul (In re Devaul)*, 318 B.R. 824, 833 (Bankr. N.D. Ohio 2004). The Court may consider the debtor's education, experience, sophistication, or any other relevant factor to determine whether the records are accurate. *Zhang*, 463 B.R. at 91. Courts enjoy

70

" 'wide discretion' " in determining whether the plaintiff established a prima facie case under § 727(a)(3).  *See Kandel*, 2015 WL 1207014, at *5 (quoting *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 252, 253 (6th Cir. 1986)).

Under either test, a court may consider the financial records of entities "substantially intertwined with the debtor's personal capacity" in determining whether a debtor's discharge should be denied under § 727(a)(3).  *Id.* at *8; *see also Daniels*, 641 B.R. at 184–85 (explaining that requiring business records from closely held companies is part of the higher burden placed on more sophisticated debtors under § 727(a)(3)).

This Court agrees with Judge Latta's reading of § 727(a)(3) in *Fry*, namely, that the proper time for ascertaining the debtor's financial condition and business transactions is when the debtor has filed for bankruptcy.  Section 727(a)(3) is not intended for creditors who were prevented from ascertaining a person's true financial condition at the time of business transactions occurring months or even years before the person filed for bankruptcy.  Such an interpretation would lead to most nondischargeability actions under § 523(a)(2) also stating a claim for denial of discharge under § 727(a)(3).

As the Third Circuit noted in explaining § 727(a)(3):

> it is intended that there be available written evidence made and preserved from which the present financial condition of

71

the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.

*Alten*, 958 F.2d at 1231 (*quoting In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)). The statutory language, which requires the debtor to justify inadequate records "under all of the circumstances of the case," requires exactly this. 11 U.S.C. § 727(a)(3). And exceptions to discharge can only be meaningful in the context of a bankruptcy case. *See Fry*, 2022 Bankr. LEXIS 251, at *19. Section 727(a)(3) prevents debtors from receiving a discharge if the falsified or mutilated financial records keep creditors from understanding a debtor's financial condition or business transactions in the context of a bankruptcy case, but the statute is not designed to address every instance in which records have been mutilated or falsified. *See Fry* at *19 (citing *Alten*, 958 F.2d at 1231) (explaining that the mutilation or falsification must have consequences in connection with the present bankruptcy case).

Here, evidence at trial established that many mortgages were improperly notarized, either because Ms. Kish notarized an unsigned document or because the debtor wrongly used an electronic copy of Ms. Kish's notary seal and signature. Creditors who received an improperly notarized mortgage may have individual nondischargeability of debt causes of action against the debtor under § 523(a). However, § 727(a)(3) denies a discharge to debtors whose financial records are

72

inadequate to determine their financial condition or business transactions in connection with their bankruptcy case. This is not such a case. While the Court does not condone the debtor's improper use of Ms. Kish's signature and notary seal, or Ms. Kish's improper notarization of unsigned documents, these improper notarizations do not prevent the Court or creditors from understanding the debtor's financial condition or business transactions in the present case.

As noted, the purpose of § 727(a)(3) is to allow the debtor's creditors to ascertain the debtor's financial condition and dealings with substantial accuracy for a reasonable period from past to present. *See Zhang*, 463 B.R. at 91 (quoting *Strbac*, 235 B.R. at 882) (additional quotation omitted). Here, at least some creditors, including Dr. Lynch, Ms. Hansen, Mr. Brian Bonetta, and Lt. Col. Chase, were aware of rumors concerning improper notarization before the debtor filed for bankruptcy. Exs. 46 at 4; 53 at 1. And the debtor was publicly charged with tampering with records, forgery, and identity fraud on October 18, 2021, well before filing for bankruptcy. Thus, the improper notarizations have not prevented creditors from understanding the debtor's financial condition or business transactions in the instant case. In no instance does the improper notarization change the debtor's liability to the creditor holding the improperly notarized mortgage. Nor does the improper notarization help the debtor to hide assets in any

73

way in the instant case. Thus, the Court concludes that the truth of the debtor's

financial condition and business transactions can be discerned with substantial

completeness and accuracy for a reasonable time extending from before the

debtor's bankruptcy case until the present, despite the improper notarizations. *See*

*Zhang*, 463 B.R. at 91 (discussing the purpose of § 727(a)(3)). Because the Court

finds that the debtor's financial condition and business transactions can be

discerned with substantial completeness and accuracy in connection with the

bankruptcy case, the Court need not decide between the "impossible to ascertain"

test adopted by the Third Circuit and other courts of appeals and the more lenient

test adopted by Judge Whipple in *Devaul*. Under either test, the U.S. Trustee has

failed to establish his claim for denial of the debtor's discharge under § 727(a)(3)

by a preponderance of the evidence.

It may be helpful to compare the facts in this case with those in another case

where the court concluded that a falsified document justified denial of discharge

under § 727(a)(3). In *In re Kresock*, the debtor (Dr. Kresock) filed with the

bankruptcy court a falsified record of a criminal judgment that purported to exempt

him from filing tax returns as a condition of his probation. *Lashinsky v. Kresock*

*(In re Kresock)*, Chap. 7 Case No. 0:16-bk-08631; Adv. No. 0:19-ap-00091,

2020 WL 7133510, at *7 (Bankr. D. Ariz. Nov. 24, 2020). Dr. Kresock

74

represented numerous times in connection with his bankruptcy case that the criminal judgment purporting to exempt him from filing income taxes was accurate. *Id.* at *6. When asked under oath if he had forged the criminal judgment, Dr. Kresock invoked the Fifth Amendment. *Id.* at *8. The court granted the U.S. Trustee's motion for summary judgment under § 727(a)(3), concluding that no reasonable factfinder could determine that Dr. Kresock did not falsify the submitted criminal judgment and that the debtor had no justification for doing so. *Id.* at *15–16.

Unlike the debtor in *Kresock*, the debtor here does not deny that the notarization of many mortgages was improper and has not attempted to mislead the Court through the filing of falsified records regarding these mortgages. The improper notarizations do not prohibit this Court or creditors from understanding the debtor's financial condition and business transactions in connection with the instant case. Through the falsified criminal judgment, the debtor in *Kresock* also attempted to evade liability to what turned out to be his largest creditor, the IRS, which is not the case here. Thus, while the Court does not sanction the improper notarization, the Court concludes that the U.S. Trustee has failed to prove his claim under § 727(a)(3), because the debtor's financial condition and transactions can be

75

adequately ascertained in the debtor's main bankruptcy case and in the current proceeding.

*Amended Count 3A- False Oaths in Connection with BUYCLE114*

The U.S. Trustee argues that the Court must deny the debtor a discharge under § 727(a)(4)(A) because he intentionally or recklessly failed to disclose an ownership or membership interest in BUYCLE114 on his schedules. A debtor may not be discharged if "the debtor knowingly and fraudulently, in or in connection with the case— (A) made a false oath or account[.]" 11 U.S.C. § 727(a)(4)(A). The plaintiff must thus prove "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." *Keeney*, 227 F.3d at 685 (citing *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)). Section 727(a)(4)(A) is intended to give the U.S. Trustee and creditors access to reliable information without the expense of investigation. *Zhang*, 463 B.R. at 86 (quotations omitted). Because trustees have neither the time nor the resources to investigate every debtor, accurate disclosure is paramount. *See Carter-Jones Lumber Co. v. Beatty (In re Beatty)*, 583 B.R. 128, 139 (Bankr. N.D. Ohio 2018).

76

Statements made in bankruptcy schedules, in the SOFA, and at the meeting of creditors are all made under oath. *See Church Joint Venture, L.P. v. Blasingame (In re Blasingame)*, 559 B.R. 692, 697 (B.A.P. 6th Cir. 2016) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)). Whether a statement is false is a question of fact. *Keeney*, 227 F.3d at 685. False statements in the debtor's schedules are enough to deny discharge. *Gandy v. Schuchardt (In re Gandy)*, 645 F. App'x 348, 352 (6th Cir. 2016). A statement is material if it " 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of property.' " *Keeney*, 227 F.3d at 686 (quoting *Beaubouef*, 966 F.2d at 178) (additional citation and quotation marks omitted). Materiality has a rather low threshold. *Beatty*, 583 B.R. at 139 (citations omitted).

A debtor knows the truth of a statement if he or she did not disclose correct information while being aware of it, or disclosed conflicting information. *See Blasingame*, 559 B.R. at 697. Often, a court's determination of whether the debtor knew the truth of a statement depends on its evaluation of the debtor's credibility. *See McDermott v. Capra (In re Capra)*, Chap. 7 Case No. 15-15907, Adv. No. 16-1010, 2016 WL 5106994, at *7 (Bankr. N.D. Ohio Sept. 19, 2016) (citing *Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002)).

77

To prove intent, a plaintiff must show that the statement involves a false material representation or an omission that gives the wrong impression. *Keeney*, 227 F.3d at 685. A reckless disregard for the truth of the representation satisfies the required intent. *Id.* at 686 (citation omitted). If an omission or material misstatement is the result of an error or accident, this omission or misstatement is not enough to deny a debtor's discharge. *Id.* (citing *Gullickson*, 108 F.3d at 1294). Courts may infer the necessary intent from the totality of circumstances in a case. *Id.* (citing *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 252 (4th Cir. 1987)). These circumstances can include how the error was discovered and the debtor's motive for the omission or misrepresentation. *See Capra*, 2016 WL 5106994, at *7 (citation omitted). A pattern or accumulation of errors or omissions can support an inference of an intent to deceive. *Id.* (citation omitted).

Here, the failure to list BUYCLE114 was made under oath, and falsely created an impression that the debtor had completely disclosed his interests in entities he controlled. The entity relates to the debtor's business interests, in that the debtor has a 100 percent ownership interest in the L.L.C. and used it to buy the Brookfield Avenue property on November 22, 2017. Therefore, the omission is material. The debtor knew that he had an ownership interest in BUYCLE114 and so he knew the failure to list the entity on his amended schedules was false.

78

However, at trial, the U.S. Trustee offered no evidence of motive for the debtor to have intentionally or recklessly failed to disclose this particular entity in the debtor's schedules.  On the contrary, the real property held by this entity, the Brookfield Avenue property, valued at $34,400, has at all times since February 9, 2022, been in the possession of a receiver, who presumably is collecting any rents for the benefit of the debtor's creditors.  *See* Exs. H at 16; 128 at 3.

The Court finds it much more likely that the debtor's failure to list BUYCLE114 was inadvertent.  The debtor listed a number of similar-sounding BUYCLE entities in his original and amended schedules and overlooking one unintentionally is certainly plausible.  The number of these entities and the fact that some of them manage a single asset increase this plausibility.  Therefore, the Court concludes that the U.S. Trustee has not proven by a preponderance of the evidence that the debtor omitted BUYCLE114 from his original and amended schedules with fraudulent or reckless intent.  Accordingly, the U.S. Trustee has failed to establish the elements under § 727(a)(4)(A) for his claim in Amended Count 3(A).

*Amended Count 3(B)— False Oaths in Connection with the F-150*

The U.S. Trustee also argues that the debtor should be denied a discharge under § 727(a)(4)(A) because he intentionally or recklessly failed to disclose the transfer of the F-150.  The Court agrees.

79

The standard for denial of discharge under § 727(a)(4)(A) has already been explained, but intent requires further discussion. Intent under both § 727(a)(2) and (4) is distinguished only by the act involved: transferring or concealing property or making a false oath. *See Beatty*, 583 B.R. at 139 (quoting *Nurick v. Burke (In re Burke)*, 523 B.R. 765, 770 (Bankr. E.D. Pa. 2015)); *see also Varner*, 2015 WL 4039390, at *13 (examining the "subtle differences between" the intent requirement under § 727(a)(2) and (4)). " 'If the Plaintiffs can prove that the Debtors omitted material assets from their schedules, materially undervalued their disclosed assets or failed to disclose material pre-petition transfers, the Debtors' discharge should be denied under either or both § 727(a)(2) or (4).' " *Beatty*, 583 B.R. at 139 (quoting *Burke*, 523 B.R. at 770–71). However, the "subtle differences" regarding intent under § 727(a)(2) and (4) should not be ignored. *Id.*; *see also Varner*, 2015 WL 4039390, at *13 (noting that a finding that the debtor lacked fraudulent intent under § 727(a)(4) "strongly weighs in favor of a similar finding under § 727(a)(2)(A)" but considering additional factors).

Here, the debtor denied on his original and amended SOFA that he had given any gifts worth more than $600 in the two years before filing for bankruptcy. Exs. 88 at 6; 97 at 8. The debtor testified that he could not remember giving anyone a gift worth over $500 in the last four years at his meeting of creditors.

Ex. 94 at 47. The debtor made these statements under oath. The Court finds that the omission misrepresented a relevant gift of the debtor's property and therefore constituted a false statement. The omission was material because it concerns the discovery of assets and the disposition of property. *See Keeney*, 227 F.3d at 686. And the debtor knew that the omission was false because he was aware of the gift of the F-150 and failed to provide that information in his original and amended SOFA and at the meeting of creditors.

The crucial question is whether the debtor had fraudulent intent. The Court concludes the debtor did have fraudulent intent and that his explanation that he simply forgot about the gift of the F-150 is not credible. Ms. Motil testified that she and the debtor both wanted her new Jeep to be titled in her name because the vehicles belonged to the businesses "and may be taken away." If the F-150 was the temporary replacement for Ms. Motil's Jeep, then the debtor and Ms. Motil would likewise want to safeguard it from creditors and would have a motive not to disclose the transfer. Both the debtor and Ms. Motil emphasized that the F-150 was important to ensure the family was taken care of, which further underscores the debtor's motive not to disclose the gift.

Further, the analysis of fraudulent intent under § 727(a)(2)(A) also strongly supports a finding that the debtor had fraudulent intent under § 727(a)(4)(A). The

81

debtor was a sophisticated businessman, making it unlikely he simply forgot about the gift. The debtor gave the vehicle to a close family member, receiving far less than the value of the vehicle, and continued to have regular access to it. The gift occurred less than a month before the debtor transferred funds to his attorney, presumably in contemplation of bankruptcy, but still did not disclose the gift. Ms. Lowman first uncovered the gift through her examination of the debtor's records. This failure to disclose permits a strong inference of fraudulent intent.

Perhaps the most telling argument in favor of the debtor's fraudulent intent is that no matter who or what entity had legal ownership of property, the debtor consistently treated property under his control as belonging to him. For example, when asked if he owned the real estate holdings at a certain point in the past, the debtor replied, "I still technically do." Thus, the debtor thought of himself, not his entities, as owning the properties. On the other hand, the debtor was well aware of the benefits of using L.L.C.s to hold real property and shield himself from personal liability and never personally owned any of the real properties relevant here, including the family's residence.

The transfer could also be seen as a transfer or sale of the F-150 for $1.00. The defendant denied that he had transferred or sold any property to anyone within the two years before bankruptcy other than in the ordinary course of business on

82

both his original and amended SOFA.  Exs. 88 at 7; 97 at 9.  Again, the defendant

could not remember selling any property worth more than $500 at the meeting of

creditors.  Ex. 94 at 46–47.

The Court finds that the statements were false because they omitted the sale

or transfer of the truck outside the ordinary course of business and created a

misleading impression that no sale or transfer occurred.  The statements in the

original and amended SOFA and at the meeting of creditors were likewise made

under oath.  The statements were material because they relate to the disposition of

the debtor's assets.  And the debtor knew he had transferred or sold the F-150, and

so he knew that the failure to disclose the transfer or sale created a false

impression.

Again, the crucial question is whether the debtor had fraudulent intent, and

again the Court finds that the debtor's explanation he forgot about the transfer or

sale not to be credible, for the reasons explained above.  The brief interval between

the transfer of the F-150 and the transfer of funds to the debtor's bankruptcy

attorney, Ms. Motil's acknowledgement that vehicles not titled in her name may be

taken away, the debtor's continued access to and use of the vehicle, and the

debtor's interest in providing for his family all suggest that the debtor intentionally

failed to disclose the transfer of the vehicle.

83

Alternatively, the Court finds that the debtor displayed a reckless indifference as to the truth of the debtor's disclosure of the gift or transfer of the F-150. The debtor did not mention the gift or transfer in his original or amended filings. When asked at the meeting of creditors, the debtor responded that he was "sure" that he had sold something in the past four years worth more than $500, but at the same time said, "There's nothing big that stands out to me." Ex. 94 at 46–47. How can both statements be true? Such responses betray a reckless indifference to the accuracy of the debtor's responses and seem at best evasive. Other answers of the debtor evidence a similar indifference and recklessness. When pressed by the trustee, the debtor responded that he did not "recall" anything specifically, "not anything that I remember somebody handing me a bunch of money for." Ex. 94 at 46–47. Similarly, when asked if he had given anything away worth more than $500 in the last four years, the debtor replied, "Not that I can think of over $500."

Even after the meeting of creditors, and in view of the vast scope of financial records sought by the U.S. Trustee, the debtor still failed to disclose the gift or transfer of the F-150, although he disclosed other omitted assets, such as a Rolex watch. Thus, the debtor's evasiveness at the meeting of creditors and his failure to disclose the transfer of the F-150 until discovered by the U.S. Trustee display a

84

recklessness to the truth that merits denial of the debtor's discharge under § 727(a)(4)(A).

The debtor's reliance on *Gullickson* is misplaced. 108 F.3d at 1290. In *Gullickson*, the debtor gave a creditor a security interest in his classic car collection four days before filing for bankruptcy to raise funds for legal fees and to pay suppliers. *Id.* at 1293. The court reversed the bankruptcy court's denial of discharge in part because the money raised in this fashion was used for a legitimate business purpose. *Id.* Other indications of fraud were absent; the money was reasonably used and not squandered. *Id.* Continued use of collateral after granting a security interest also proved insufficient grounds to deny discharge. *Id.* Here, however, there was no legitimate business purpose for the transfer. The *Gullickson* court also opined: "There is little question that if an individual transfers *title* of an item but continues to exercise dominion over it, that fraud could be inferred." *Id.* (italics in original). Such is the case here.

In sum, the U.S. Trustee has proven all the required elements, including fraudulent or reckless intent, to deny the debtor a discharge under § 727(a)(4)(A) with respect to the gift, sale, or transfer of the F-150.

85

*Amended Count 4 — Dissipation of Assets*

Finally, the U.S. Trustee argues that the debtor's discharge should be denied under § 727(a)(5) because the debtor failed to explain the loss of assets to meet liabilities. The Court concludes that the U.S. Trustee has failed to prove this claim under § 727(a)(5) by a preponderance of the evidence because the evidence produced at trial satisfactorily explains the loss or deficiency of the debtor's assets.

Under § 727(a)(5), the Court should deny a debtor a discharge if—

> the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities[.]

11 U.S.C. § 727(a)(5). Denial of discharge under § 727(a)(5) is closely related to denial of discharge under § 727(a)(3). *See McDermott v. Roller (In re Roller)*, Chap. 7 Case No. 12-61145; Adv. No. 13-6050, 2014 WL 644590, at *15 (Bankr. N.D. Ohio Feb. 19, 2014) (citation omitted). *See also PNC Bank, Nat'l Ass'n v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 116 (Bankr. W.D. Pa. 2000) (citing *Panuska v. Johnson (In re Johnson)*, 80 B.R. 953, 960 n.8 (Bankr. D. Minn. 1987)) (" '11 U.S.C. § 727(a)(5) is designed to work in tandem with § 727(a)(3), to foster the same process of investigation and disclosure [promoted by § 727(a)(3) ], by requiring a debtor to give a satisfactory explanation of his insolvency, after the commencement of the bankruptcy case.' ") (alterations in original).

86

Courts employ a burden-shifting framework under § 727(a)(5).  First, the party seeking to deny discharge must "identify assets that the debtor owned at one time and subsequently claims to no longer possess."  *McDonald*, 29 F.4th at 822 (citing *Devaul*, 318 B.R. at 840).  The assets should be " 'substantial and identifiable.' "  *Id.* (citing *Devaul*, 318 B.R. at 839).  In *McDonald*, the Sixth Circuit refused to specify a defined lookback period, observing that, though courts frequently focus on the two years preceding a debtor's filing for bankruptcy, often the period must be extended further, citing one case going back nine years.  *Id.* at 822–23 (citing *In re D'Agnese*, 86 F.3d 732 (7th Cir. 1996) (allowing a nine-year lookback period)).

Once the specific assets have been identified, the debtor must offer a "satisfactory explanation" for the loss of assets, which "must contain more than vague guesses and conclusory statements."  *Id.* at 823.  When a court examines whether an explanation is adequate, " 'the issue is whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper.' "  *Zhang*, 463 B.R. at 90 (citing *1720 Ent. L.L.C. v. Palmer (In re Palmer)*, 419 B.R. 762, 772 (Bankr. M.D. Tenn. 2009)) (further citation omitted).  *See also Shappell's Inc. v. Perry (In re Perry),* 252 B.R. 541, 550 (Bankr. M.D. Fla. 2000) (same); *Buzzelli*, 246 B.R. at 117 (same); *Cho v. Park (In*

87

*re Park)*, 682 F. App'x 88, 93 (3d. Cir. 2017) (same); *Buckeye Retirement Props.*

*of Ind., L.L.C. v. Tauber (In re Tauber),* 349 B.R. 540, 564 (Bankr. N.D. Ind. 2006)

(for purposes of § 727(a)(5), "the debtor does not need to justify the wisdom or

prudence in the disposition of assets"); *Clippard v. Jarrett (In re Jarrett)*, 417 B.R.

896, 905–06 (Bankr. W.D. Tenn. 2009) (same). *Accord Cobra Well Testers,*

*L.L.C. v. Carlson (In re Carlson)*, No. 06-8158, 2008 WL 8677441, at *5

(10th Cir. Jan. 23, 2008).   No fraudulent intent is required; the court evaluates

only the adequacy of the debtor's explanation of the loss of assets.  *See McDonald*,

29 F.4th at 823; *see also Roller*, 2014 WL 644590, at *15 ("Section 727(a)(5) does

not evaluate the culpability of a debtor's state of mind, but instead it is only

interested in the adequacy of a debtor's explanation.").

At trial, the U.S. Trustee argued that the debtor has failed to account for

$4,345,505 in assets, and the debtor provided a list of expenditures he argued

accounted for this difference.  *See* Am. Compl. 28–31, 37; Ex. Q.  The

U.S. Trustee also argued that the debtor failed to explain satisfactorily the loss of

the F-150 he purchased and transferred on the eve-of-bankruptcy to his wife.

Am. Compl. 31, 37.

Ms. Lowman successfully demonstrated that many of the debtor's

accounting practices, as documented on the software QuickBooks, reflected a lack

88

of experience.  She noted that tax returns the debtor prepared for the entities he

controlled did not correspond to the figures on the entities' profit and loss

statements, and that the debtor treated several categories of transactions

inappropriately.  For example, the debtor often treated deposits of earnest money

as security deposits, and lender reserves as an asset when they should have been

treated as a liability or as a depreciating asset.  The debtor also failed to reconcile

business expenses with the amounts he paid for credit card balances, so that profit

and loss statements appeared to show credit card *credits* or overpayments in excess

of $900,000.  Exs. 104 at 18–19; 106 at 21.  These numbers indicate that if

expenses (whether properly business expenses or improper personal expenses

charged to the business entities) were included, there would be even less money

available to meet the debtor's liabilities.

Although the U.S. Trustee demonstrated significant inaccuracies in the

debtor's tax and accounting records, this does not mean that "the debtor has failed

to explain satisfactorily, before determination of denial of discharge

under [§ 727(a)(5)], any loss of assets or deficiency of assets to meet the debtor's

liabilities."  11 U.S.C. § 727(a)(5).  True, the debtor has the burden of production

in explaining the dissipation of assets.  *See McDermott v. McDonald (In re*

*McDonald)*, 614 B.R. 801, 812 (Bankr. N.D. Ohio 2020) (clarifying that the

89

debtor, as the person best suited to explain the loss of an asset, has the burden of producing evidence to do so).  But because together the debtor and the U.S. Trustee produced sufficient evidence at trial to provide a satisfactory explanation for the loss of investor funds, the Court may rely on such evidence, even if the debtor alone had the burden to produce it.  And the debtor's explanation for the loss of his entities' assets, while imperfect, is consistent with the other evidence produced at trial.

Based on this evidence, the overall picture of the debtor's transactions and financial status seems reasonably clear.  As explained above, the debtor's financial records demonstrate a pattern of lavish spending on the debtor's lifestyle maintained through investor funds.  NSES and NSEM would both directly finance the debtor's lifestyle and indirectly finance it by paying for his consumer purchases on his credit card.  At trial, Ms. Lowman convincingly explained how the ledgers for the debtor's entities revealed that payments on credit cards had not been reconciled with business expenses.  And entities receiving investor funds, such as NSES and NSEM, would also prop up gym operations by transferring these investor funds to ALV Twinsburg.  These larger trends explain where investor funds have gone, even if the details are at times unclear.

90

In addition to these larger trends, the debtor promised to pay high rates of interest, typically 12 percent per year, and at least in one case 3 1/3 percent per month, while at the same time paying property managers to care for his properties and collect rent from individual tenants. Rents proved inadequate to supply the necessary cash flow and to support the debtor's other expenses such as courtside Cavaliers tickets, trips to Disney properties, Disney cruises, his expensive aquarium hobby, or the $25,000 the debtor paid a sales coach to help market his cannabis-related patent. When short-term financing became problematic, the debtor was unable to find alternative financing or sell his real estate portfolio for a sufficient price to repay all investors.

Although the U.S. Trustee in his amended complaint dropped any references to the Ponzi-like nature of the debtor's dealings with private investors, the evidence at trial strongly suggests that this is exactly what the debtor was doing when he solicited funds from private investors with a promise of high interest rates backed by purported first-lien mortgages in real property. *Cf. Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615 (Bankr. S.D. Ohio 2006):

> A Ponzi scheme is a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate business operations, although investors may believe an actual business exists from which profits are derived.

91

*Id.* at 629 (citations omitted). The debtor may have subjectively believed that all of these private investors would be paid in full from the profits of his real estate and other business ventures. But the record at trial establishes that the debtor's legitimate business ventures never generated sufficient profits to meet expenses, let alone pay for the debtor's lavish lifestyle and the high interest rates he kept promising his private investors. As the debtor struggled to find new investors to pay the interest and principal promised to earlier investors, the debtor's legitimate business ventures suffered various setbacks of their own, leading to the inevitable demise of the Ponzi-like operation.

These setbacks included:

- The debtor lost his partners in the Twinsburg gym and became solely responsible for the gym's finances.

- The owner of the Lake Road property that the debtor was renting balked at selling the property, at least at a price the debtor was hoping to pay.

- ALV Cleveland, L.L.C. purchased a gym in downtown Cleveland at the height of the COVID-19 pandemic.

- NSES made deposits of $350,000 in the Watermark deal, which became the subject of a legal dispute.

- The COVID-19 pandemic required closure of the debtor's gyms and decreased rental income.

- Rumors concerning improper notarizations and multiple mortgages on properties may have chased away potential investors.

92

The evidence produced at trial thus provides a satisfactory explanation of how and why the investor funds have disappeared. Exhibit 126 is especially helpful in showing the debtor's practice of managing his entities' cash flow by repaying earlier investors and spending on the debtor's lifestyle, especially credit card purchases, as well as other business pursuits. In general, as soon as the debtor received investor funds, the money was redirected elsewhere. Granted, the debtor's spending of investor money on his personal lifestyle and other business pursuits may be improper, but this is not the essential question for purposes of § 727(a)(5). The essential question is whether the evidence produced at trial satisfactorily explains the loss or dissipation of the debtor's assets, not whether what happened to the assets was proper. *See*, *e.g.*, *Zhang*, 463 B.R. at 90 and other cases cited earlier at pages 87–88.

Comparison with the debtor in *McDonald* may be helpful. *McDonald*, 29 F.4th at 817. In *McDonald*, the debtor was an experienced banker who failed to account for more than $75,000 worth of checks drawn from fraudulent loans. *Id.* at 819, 823. He also blamed the loss of $100,000 in a brokerage account on gambling and day-trading, without corroborating evidence. *Id.* at 823. Reviewing the evidence, the Sixth Circuit panel concluded that "[a] threadbare recitation from memory of what McDonald claims to recall is not enough." *Id.* In view of the

93

shortcomings of McDonald's memory, the lack of corroboration, and the debtor's experience, the panel concluded that it could not "say that [the debtor's] vague, evasive explanations were enough to satisfy the requirements of § 727(a)(5)." *Id.* at 824.

In the current proceeding involving Dr. Motil, the Court can draw on evidence, including bank account statements, credit card statements, and witness testimony, that is credible enough to draw reliable conclusions. The Court is not left to rely on the debtor's word alone. The evidence details the debtor's lavish spending on personal expenses, repayment of earlier investors with new investors' funds, and funneling investor funds toward the debtor's other business endeavors. These trends, especially when coupled with the other reasons identified for the loss of investor funds, provide a satisfactory explanation for how and why investor funds have disappeared.

In a way, some of the allegations in the U.S. Trustee's amended complaint provide their own answer as to why there are insufficient assets to meet the debtor's liabilities. *See* Am. Compl. 30–31. The U.S. Trustee alleged that the debtor "routinely and wantonly used the cash assets that creditors lent to the corporate entities . . .

- "to make interest payments to other creditors";

94

- "to cover the operating losses on the gyms";

- "to pay the liabilities of other corporate entities the Defendant controlled"; and

- "to make personal purchases, transfers to himself, family members, and to his individual creditors to fund an extravagant personal lifestyle."

*Id.* at 30–31.

Although the U.S. Trustee further alleged in the Amended Complaint (and provided ample evidence at trial) that "the Defendant routinely and wantonly treats apparent personal purchases, transfers to himself, family members, and to his individual creditors as business expenditures," *id.* at 31, the issue under § 727(a)(5) is "whether the explanation satisfactorily describes what happened to the assets, not whether what happened to the assets was proper." *Zhang*, 463 B.R. at 90 (quotations and quotation marks omitted).

The U.S. Trustee also argued that the debtor failed to explain satisfactorily the loss of the F-150 he purchased and transferred on the eve-of-bankruptcy to his wife. Am. Compl. 31, 37. While the U.S. Trustee has met his burden of identifying a substantial asset that the debtor no longer owns, the debtor's explanation for what happened to F-150 is sufficient. The transfer of the F-150 to the debtor's wife is documented through credible evidence introduced at trial. The debtor asked his father for $50,000. The debtor's father transferred $50,000, into

95

the joint checking account of the debtor and the debtor's wife. The debtor paid $18,654.20 for the F-150 and took title to the truck. The debtor then transferred title to the truck to his wife for no consideration about one month before he transferred $20,000 to his bankruptcy attorney and about two months before filing his voluntary bankruptcy petition.

While the debtor's transfer of the F-150 to his wife may have been improper, for purposes of § 727(a)(5) an improper purpose is irrelevant. *See, e.g.*, *Zhang*, 463 B.R. at 90 and other cases cited earlier at pages 87–88. Thus, the debtor's explanation of the loss of the F-150 is sufficient, and the U.S. Trustee has not proven the debtor should be denied a discharge under § 727(a)(5) with respect to this transfer.

In sum, while the U.S. Trustee's auditor may rightfully be appalled at the debtor's accounting practices and the debtor's use of business funds to pay for personal expenses, the U.S. Trustee has not established the debtor's failure to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities under § 727(a)(5) in Amended Count 4.

## CONCLUSION

The U.S. Trustee has established the elements for denial of the debtor's discharge by a preponderance of the evidence as to two of the six claims for relief

96

in the U.S. Trustee's amended complaint.  Those two claims are

Amended Count 1(B), involving the prepetition transfer of a 2009 Ford F-150 with

the intent to hinder, delay, or defraud creditors under § 727(a)(2)(A), and Amended

Count 3(B), the making of false oaths concerning the same vehicle under

§ 727(a)(4)(A).  As to the other four claims for relief, the U.S. Trustee has failed to

establish the elements for denial of the debtor's discharge by a preponderance of

the evidence.


      IT IS SO ORDERED.